**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| LADARION HUGHES, ANGELA ALONZO, AND DEMARCUS LIVELY, individually and as representatives of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>SMITH COUNTY, TEXAS,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ........................................................................................................... 1

PARTIES ........................................................................................................................... 2

JURISDICTION AND VENUE .................................................................................... 3

STATEMENT OF FACTS .............................................................................................. 3

    I.    Smith County has a policy and practice of detaining people at the Jail for days or weeks after the expiration of their sentences. ........................................................... 3

    II.   Named Plaintiffs were unlawfully incarcerated at the Jail after they completed their sentences and were entitled to release. ................................................................. 12

       a.    Ladarion Hughes was overdetained for twenty-seven days as a result of Defendant's unlawful policies and practices. .......................................................... 12

       b. Angela Alonzo was overdetained for thirty-three days as a result of Defendant's unlawful policies and practices. ....................................................................... 13

       c. Demarcus Lively was overdetained for eight days as a result of Defendant's unlawful policies and practices. .......................................................................... 15

CLASS ACTION ALLEGATIONS ............................................................................ 16

    Numerosity: Fed. R. Civ. P. 23(a)(1) ..................................................................... 17

    Commonality: Fed. R. Civ. P. 23(a)(2) .................................................................. 17

    Typicality: Fed. R. Civ. P. 23(a)(3)......................................................................... 18

    Adequacy: Fed. R. Civ. P. 23(a)(4) ........................................................................ 19

    Predominance and Superiority: Fed. R. Civ. P. 23(b)(3) ................................... 19

CLAIM FOR RELIEF .................................................................................................. 20

JURY DEMAND ........................................................................................................... 21

PRAYER FOR RELIEF .............................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980) ............................................................... 20

*Foucha v. Louisiana*, 504 US 71 (1992)............................................................................. 1

*Moya v. Garcia*, 887 F.3d 1161 (10th Cir. 2018) ............................................................. 1

*Porter v. Epps*, 659 F.3d 440 (5th Cir. 2011) ................................................................... 1

*Powell v. Barrett*, 376 F. Supp. 2d 1340 (N.D. Ga. 2005)............................................. 20

*Whirl v. Kern*, 407 F.2d 781 (5th Cir. 1968)................................................................... 20

**Statutes**

18 U.S.C. § 1964 .............................................................................................................. 22

28 U.S.C. § 1331 ................................................................................................................ 3

28 U.S.C. § 1343 ................................................................................................................ 3

42 U.S.C. § 1983 ..................................................................................................... 2, 3, 20

42 U.S.C. § 1988 .............................................................................................................. 22

Fed. R. Civ. P. 23 ...................................................................................................... passim

Tex. Code Crim. P. § 42.09 ............................................................................................... 4

**Other Authorities**

Legal Information Institute, Cornell Univ. Law School,
    https://www.law.cornell.edu/wex/time_served (last visited July 10, 2023) .............................. 4

## INTRODUCTION

1.      Smith County, Texas (the "County") has an unlawful policy and practice of detaining people at the Smith County Jail (the "Jail") after the legal basis for their detention has ended. Specifically, the County detains people for unreasonably long periods of time after the expiration of their felony sentences because it relies on a disjointed, paper-based system of sharing information amongst the County agencies that must send records to the Texas Department of Criminal Justice ("TDCJ") in order to finalize release. Because of the County's unlawful and deficient policies and practices, Ladarion Hughes was overdetained[1] for twenty-seven days after he was entitled to release; Angela Alonzo was overdetained for thirty-three days; and Demarcus Lively was overdetained for eight days.

2.      Smith County violated the Named Plaintiffs' constitutional rights. The Supreme Court has recognized that "freedom from bodily restraint" is one of the most important protections of the Due Process Clause. *Foucha v. Louisiana*, 504 US 71, 80 (1992). And the Fifth Circuit has held that there is a "clearly established right to timely release from prison." *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011). Yet, the County has a policy and practice of overdetaining individuals for days and weeks after they are entitled to release. The County's failure to institute policies that ensure that people in its Jail are released within a reasonable time after the legal basis

---

[1] As the Tenth Circuit explained, "overdetention" has become a term of art. It means that a "plaintiff has been imprisoned by the defendant for longer than legally authorized, whether because the plaintiff's incarcerative sentence has expired or otherwise." *Moya v. Garcia*, 887 F.3d 1161, 1171 (10th Cir. 2018) (McHugh, J., concurring in result in part and dissenting in part).

for their detention ends constitutes deliberate indifference. Named Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 to redress violations of their and Class Members' rights under the United States Constitution. They seek money damages on behalf of themselves and a proposed class.

## PARTIES

3.      Plaintiff Ladarion Hughes is an adult resident of Texas. As a result of Defendant's policies and practices, Hughes was subjected to twenty-seven days of unlawful incarceration at the Jail from late 2021 to early 2022.

4.      Plaintiff Angela Alonzo is an adult resident of Texas. As a result of Defendant's policies and practices, Alonzo was subjected to thirty-three days of unlawful incarceration at the Jail in 2022.

5.      Plaintiff Demarcus Lively is an adult resident of Texas. As a result of Defendant's policies and practices, Lively was subjected to eight days of unlawful incarceration at the Jail in 2022.

6.      Defendant Smith County, Texas, is a political subdivision organized under the laws of the State of Texas. Smith County operates the Sheriff's Office, the District Clerk's Office (the "Clerk's Office"), and the District Attorney's Office (the "DA's Office), and employs all personnel for the offices. District Clerk Penny Clarkston, Sheriff Larry R. Smith, and District Attorney Jacob Putnam are final policymakers for Smith County regarding the policies and practices with respect

2

to releasing people from the Smith County Jail after they have completed their sentences. The County's policies and practices with respect to releasing people from the Jail after they have completed their sentences are inadequate and unreasonable. They detain individuals in the Jail for days or weeks after they have completed their sentences. The need for different procedures is so obvious that the County's failure to promulgate and implement them constitutes deliberate indifference to Plaintiffs' and Class Members' constitutional rights.

## JURISDICTION AND VENUE

7.      This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. This court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8.      Venue is proper in this District and Division because all events complained of occurred in this District and Division.

## STATEMENT OF FACTS

I.      **Smith County has a policy and practice of detaining people at the Jail for days or weeks after the expiration of their sentences.**

9.      In Smith County, when a person detained at the Jail is sentenced to time served[2] or completes the term of their incarceration for a felony offense at the Jail, the County must complete

---

[2] "'Time served' is a term colloquially used by courts when imposing a sentence that is deemed to be completely satisfied by the defendant's previous time spent in custody while awaiting sentencing. When a judge sentences a defendant to 'time served,' the sentence is the same as [or less] the time the defendant has spent in jail, and the defendant is set free." Legal Information

3

two administrative steps prior to their release: (1) create a "pen packet," which includes the person's basic sentencing information, and (2) send the pen packet to TDCJ to finalize release.[3] TDCJ customarily finalizes release within hours of receiving the pen packet.

10.     Because Smith County employs an inadequate, disjointed, paper-based system, it routinely takes the County days or even weeks to create and send pen packets to TDCJ, which forces people who have already completed their sentences, or who will imminently complete their sentences, to remain incarcerated in the Jail after they should have been released.

11.     In September 2022, a high-level assessment of the Jail's operations commissioned by Smith County found that its process of creating and sending pen packets to TDCJ was deficient and concluded that "[s]lowdowns in this process have a direct impact on inmate population and saddle the [C]ounty with the expense of housing inmates that could have been transferred to TDCJ [or released from custody]." (Ex. 1 at 21.)

12.     When a sentence is imposed, that fact is known to those in the courtroom: the judge, the judge's staff, the prosecutor's office, the bailiff. That fact is recorded in the sentencing paperwork, which is transmitted to the Clerk's Office, TDCJ, and the Sheriff's Office.

---

Institute, Cornell Univ. Law School, https://www.law.cornell.edu/wex/time_served (last visited July 10, 2023).

[3] *See* Tex. Code Crim. P. § 42.09(f) ("[T]he county sheriff is responsible for ensuring that documents and information required by this section [or pen packets] accompany defendants sentenced by district courts in the county to the Texas Department of Criminal Justice.")

13.    On information and belief, Smith County's policies, practices, and customs include no method for identifying people who are entitled to release on or about the date they are sentenced, nor does it prioritize processing their sentencing paperwork over less time-sensitive tasks.

14.    The release process begins with the Clerk's Office, which is responsible for creating the first portion of the pen packets.

15.    The Clerk's Office has no policy in place dictating the timeframe in which pen packets must be created after a person is sentenced. It creates pen packets without priority, whenever it sees fit, or whenever it gets around to it.

16.    Although the Clerk's Office is aware of the identities of those who are entitled to be released on or about the date they are sentenced, its policy does not involve any measures to produce their pen packets timely.

17.    Jail staff, court judges, and even TDCJ routinely prompt the Clerk's Office to create pen packets for individuals who have completed their sentences and are detained at the Jail.

18.    For example, on August 5, 2021, Judge Jack Skeen's staff emailed the Clerk's Office, requesting that it create a pen packet for a person who was sentenced to time served, and entitled to release, on July 8, 2021, almost a month earlier:

From:      Penny Clarkston
To:        Janessa Deleon
Subject:   FW: 241-0922-19
Date:      Thursday, August 5, 2021 9:54:38 PM

Would you see if you can find this?  Thanks.

From: Denise Langston
Sent: Thursday, August 5, 2021 2:26 PM
To: Penny Clarkston <PClarkston2@smith-county.com>; Gina McClung <GMcClung@smith-county.com>
Cc: Meghan Willis <MWillis@smith-county.com>; Melissa Wilgus <MWilgus@smith-county.com>
Subject: 241-0922-19

CAN YOU PLEASE LOCATE THIS FILE AND EXPEDITE THE PEN PACKET.  He was sentenced on July 8th and is time served.

JACK SKEEN, JR., Judge
DENISE LANGSTON | Court Administrator | 241st District Court | 903.590.1634



(Ex. 2 at 1 (highlighting added).)

19.    On November 23, 2021, TDCJ emailed the County seeking a pen packet for Zabrina W., who had already been sentenced and was at the Jail awaiting release: "Do you have a copy of the pen packet for the above inmate? Her father keeps calling every 15 minutes."[4] (*Id.* at 7.)

20.    After the Clerk's Office creates a pen packet for a person who has been sentenced, an employee leaves the pen packet in a stack for Sheriff's Office staff to pick up.

_____

[4] Court records show that Zabrina was sentenced to time served on September 27, 2021. But, as the email shows, the County had not sent her pen packet to TDCJ as of November 23, 2021. Jail records show that Zabrina was not released from the Jail until November 23, 2021, 57 days after she was sentenced to time served and entitled to be released from the Jail.

21.     The Clerk's Office does not notify the Sheriff when pen packets have been created, placed in the stack, and are ready to be picked up, as shown by the following emails.

22.     On November 17, 2021, at 8:59 a.m., a TDCJ employee, Yvonne Mills, emailed Terry Morrow, a Clerk's Office employee, asking for the pen packet of an individual who had been sentenced. (*Id.* at 3-4.)

23.     On November 17, 2021, at 9:55 a.m., Morrow responded that the pen packet "is in the stack ready to be picked up." (*Id.* at 3.)

24.     Weeks later, on December 8, 2021, at 2:28 p.m., Mills again emailed Morrow seeking the status of the pen packet. (*Id.* at 3.)

25.     On December 8, 2021, at 2:40 p.m., Morrow responded: "The jail picked up that pen packet on 11/29/2021" (*id.* at 2), twelve days after the Clerk's Office placed it in the stack for pick up.

26.     In the email, Morrow explained that "[o]nce [the pen packet] leaves the District Clerk's Office, it is in the hands of the sheriff's department."[5] (*Id.*)

27.     After the Clerk's Office creates the pen packet and places it in a tray, the Sheriff's Office is responsible for retrieving the pen packet.

28.     Emails show that neither the Clerk's Office nor the Sheriff's Office maintains an adequate system for keeping track of pen packets.

---

[5] Notably, as of the date of the email, December 8, 2021, the Sheriff's Office had not sent the pen packet to TDCJ, despite picking it up from the Clerk on November 29, 2021, nine days earlier.

7

29.     On July 8, 2021, at 10:11 a.m., after receiving an inquiry from TDCJ regarding the pen packet of an individual at the Jail, Sheriff's Office employee Sergeant Custer sent the following email to the Clerk's Office: "Any chance there's a pen pack laying around up there for [Wayne M.]. Or maybe know someone that may know?" *Id.* at 6.

30.     In another email dated December 22, 2021, Sergeant Custer described how he sometimes retrieved pen packets: "You have no doubt seen me sneaking around the office stealing pen packs on occasion." *Id.* at 8.

31.     After the Sheriff's Office picks up pen packets from the stack at the Clerk's Office, it adds two documents and sends them to TDCJ to approve the detainee for release.

32.     The Sheriff's Office picks up pen packets from the Clerk's Office, adds the remaining documents, and sends them to TDCJ without priority, whenever it sees fit, or whenever it gets around to it.

33.     For example, as the Mills and Morrow emails show, in November 2021, the Sheriff's Office went at least twelve days between trips to the Clerk's Office to pick up pen packets. *See supra* ¶ 25.

34.     Emails show that the Sheriff's Office does not maintain a system for keeping track of the status of pen packets once they have been picked up from the Clerk's Office.

35.     Based on Mills's December 8, 2021, email, the Sheriff's Office still had not sent the pen packet to TDCJ nine days after picking it up from the Clerk's Office (on November 29, 2021). *See supra* ¶ 25.

36.     In another case, on April 30, 2021, Sergeant Custer emailed a Sheriff's Office employee asking whether the pen packet of a detainee sentenced one month earlier had been sent to the TDCJ: The detainee was "[s]entenced back in March, but her custody status [is] still showing pre-trial. *Not sure if/when [the] pen pack was sent.*" (Ex. 2 at 5 (emphasis added).)

37.     A third email reveals the County's failure to adopt a system to sufficiently track pen packets and when they are sent: In a January 28, 2022, email, a Sheriff's Office employee emailed TDCJ to ask about the status of a detainee who was still detained in the Jail after receiving a time served sentence: "Can I get your help on a possible release? Dustin [W.] [] was sentenced to 10 months State Jail and should already be time served. Can you look at this and let me know what you find out?" (*Id.* at 9.)

38.     The Sheriff's Office employee did not know whether the detainee's pen packet had been sent to TDCJ.

39.     TDCJ sent the following in response to the Sheriff's Office employee's January 28 email: "He is not in our system – when did his pen packet get submitted?" (*Id.*)

40.     The Sheriff's Office employee later responded: "Well I think I emailed you prematurely sorry to bother you we got it worked out. Thank you" (*Id.*)[6]

---

[6] The Sheriff's Office did not have it worked out. Dustin W., the detainee at issue, was entitled to release on January 8, 2022. But as of January 28, 2022, the Sheriff's Office still had not sent his pen packet to TDJC, *see supra* ¶ 37, even though he had been entitled to release for twenty days. Dustin was not released from the Jail until February 3, 2022, twenty-six days after the expiration of his sentence.

41.     The Sheriff routinely sends incomplete pen packets to TDCJ, which slows down the release process because TDCJ cannot approve a detainee for release until it receives a completed pen packet.[7]

42.     In a December 22, 2021, email to the Clerk's Office, Sergeant Custer notes his awareness that the pen packets that the Sheriff sends to TDCJ are usually incomplete and discusses the general dysfunction and inefficiency of the County's release process: "*TDCJ is emailing us daily about receiving only partial documents or packets,* and they're telling us that the district clerks are sending them. However, we run into issues where either TDCJ or the clerks here are telling us that the pen pack was sent to us. TDCJ has been receiving judgements and other forms directly from the clerks, but asking us for pen packs that we have yet to receive." (*Id.* at 8 (emphasis added).)

43.     The Clerk's and Sheriff's Offices have long been aware that its inefficient, paper-based pen packet system causes people who have already served their sentences to be unnecessarily incarcerated in the Jail for days, weeks, and sometimes even months. (*See, e.g.*, *id.* at 1, 3, 8, 11-14.)

44.     In the December 22, 2021, email to the Clerk's Office about the inefficiencies of the County's system, Sergeant Custer stated: "I'm certain your clerks receive hundreds of calls

---

[7] *See also* Ex. 1 at 20 (finding that "the county has not been submitting complete penitentiary (pen) packets for those convicted inmates awaiting transfer to TDCJ").

from families just as we do in reference to this," namely people being detained in the Jail after they have served their sentences because their pen packets have not been sent to TDCJ. (*Id.*)

45.     In February 2022, the County adjusted its pen packet policies. Since then, the Sherriff's Office and the Clerk's Office independently upload the relevant documents they possess to an electronic pen packet drive, which the DA's Office maintains. After all the documents are uploaded to the drive, the DA's Office forwards the pen packet to TDCJ. (Ex. 2. at 10.)

46.     Upon information and belief, Smith County's policies, practices, and customs still do not include a method for identifying people who are entitled to release on or about the date they are sentenced, nor prioritizing processing their sentencing paperwork over any other less time-sensitive tasks.

47.     Upon information and belief, Smith County still does not have a policy in place dictating the timeframe in which the Sheriff's and Clerk's office must compile pen packets for people who have been sentenced and are at the Jail awaiting release. It also does not have a policy dictating the timeframe in which the DA's Office must send finalized pen packets to TDCJ.

48.      The new policy, like the old, has caused individuals to remain incarcerated at the Jail for days and weeks after the expiration of their sentences.

49.     Undersigned counsel reviewed records of over fifty individuals who appeared in Smith County District Court during four months of the class period, two before and two after the County altered their pen packet procedures (December 2021, January 2022, May 2022, and December 2022). Some of those individuals were sentenced at court appearances that occurred in later months.

11

50.     After the disposition of their cases, ten of the fifty individuals (including the Named Plaintiffs) were entitled to immediate release from the Jail.

51.     All ten of the individuals who were entitled to immediate release from the Jail were overdetained.[8]

52.     Additionally, undersigned counsel have, through a review of County emails (*e.g.*, Ex. 2), identified five others who were overdetained at the Jail after the expiration of their sentences since 2021.[9] In each of those cases, Defendant was made aware of the overdetention by a third party.

## II.     Named Plaintiffs were unlawfully incarcerated at the Jail after they completed their sentences and were entitled to release.

### a.   Ladarion Hughes was overdetained for twenty-seven days as a result of Defendant's unlawful policies and practices.

53.     Ladarion Hughes was sentenced to time served on December 16, 2021, after being detained at the Smith County Jail for over two years without a conviction.

54.     On December 17, 2021, Lieutenant Shoemaker, head of Central Jail Operations for the County, acknowledged that Hughes was entitled to immediate release. In an email, he wrote

---

[8] In addition to the Named Plaintiffs, Dylan M. (b. 1992); Lakendria T. (b. 2000); Michael W. (b. 1984); Negaise J. (b. 1993); Jose B. (b. 1987); T. Herring (b. 1971); and Erik G. (b. 1993) were overdetained for between three and thirty-three days.

[9] Brandon J. (b. 1991); Wayne M. (b. 1976); Amber S. (b. 1988); Zabrina W. (b. 1990), *see supra* note 4; and Dustin W. (b. 1994), *see supra* note 6; were overdetained for between ten and fifty-seven days.

that Hughes "received a 2-year sentence on his current charge. . ." and "if this is the case [Hughes] should be time served."

55.     Nevertheless, Smith County detained Hughes for twenty-seven days without legal authority.

56.     During those twenty-seven days, Hughes submitted multiple grievances to the Jail, demanding to be released, but did not receive a response until after he was released from the Jail.

57.     For example, Hughes submitted a grievance on January 4, 2022, notifying the Jail that he had served his time and demanding to be released. The Jail did not respond to his January 4, 2022, grievance until four months later—long after he had been released.

58.     On January 12, 2022, twenty-seven days after he was sentenced to time served, and entitled to release, the Jail finally sent Hughes' paperwork to TDCJ.

59.     That same day, TDCJ signed off on the sentencing paperwork and Hughes was released from the Jail.

### b. Angela Alonzo was overdetained for thirty-three days as a result of Defendant's unlawful policies and practices.

60.     Angela Alonzo was arrested for a probation violation and booked into the Smith County Jail on January 20, 2022, and was detained pending the resolution of her case.

61.     On March 18, 2022, she pled guilty to the charges against her and received a time served sentence, which entitled her to immediate release from the Smith County Jail.

62.     After pleading guilty, Alonzo was taken back to the Smith County Jail.

13

63.     Alonzo's mother and young child attended the March 18, 2022, court appearance and, after finding out that she was entitled to immediate release, waited outside of the Jail for her to be released.

64.     After waiting outside of the Jail for eight hours, Alonzo's mother and child finally gave up and left the Jail without her.

65.     Alonzo was not released from the Jail on March 18, 2022.

66.     The following day, Alonzo began asking Jail staff why she had not been released, but no one would give her an answer.

67.     On March 19, 2022, Alonzo filed her first grievance with the Jail demanding to be released, but received no answer.

68.     Over the next few weeks, Alonzo continued asking Jail staff every single day why she had not yet been released. She was told that Jail staff was busy because the Jail was under investigation, and they simply had not gotten around to taking the necessary steps to process her release.

69.     During those weeks, Alonzo filed two or three grievances per week with the Jail, demanding to be released, but they all went unanswered.

70.     Alonzo's mother called the Jail on March 19, 2022, asking why her daughter had not been released yet, and was told that the Jail was waiting on paperwork. Over the following weeks, Alonzo's mother called the Jail, the Clerk, and other County officials multiple times telling them that Alonzo was entitled to release and asking when she would be released, but no one offered to look into the matter or assist her.

14

71.     On April 11, 2022, over three weeks after Alonzo was sentenced to time served, the Smith County DA sent Alonzo's pen packet to TDCJ, copying staff at the Smith County Jail.

72.     Upon information and belief, TDCJ approved Alonzo for release within 24 hours of receipt of the pen packet.

73.     But Smith County still did not immediately release Alonzo.

74.     Alonzo was not released from the Jail until April 20, 2022, thirty-three days after she was sentenced to time served and the legal basis for her incarceration ended.

### c. Demarcus Lively was overdetained for eight days as a result of Defendant's unlawful policies and practices.

75.     Demarcus Lively was transferred from state prison to the Smith County Jail on December 12, 2021, after being approved for parole on an unrelated criminal charge.

76.     Lively's eligibility for release on parole was affected by the existence of the pending criminal charge. On information and belief, TDCJ suspended or rescinded his parole release until the Smith County charge was resolved.

77.     In January 2022, Lively pled guilty to his Smith County charge and was sentenced to fourteen months in TDCJ, with credit for time served of at least 338 days, making him eligible for release on June 11, 2022.

78.     Lively needed the Smith County hold to be lifted before he could be considered to have his parole reinstated. Smith County's delays in processing his sentence for the local charge delayed his ultimate eligibility for release on parole for the unrelated charge.

79.     On October 13, 2022, Lively was again paroled on his state prison sentence, and was entitled to immediate release from the Jail.

80.     Lively was not released from the Jail until October 21, 2022, eight days later.

81.     During the intervening week, Lively submitted several grievances to the Jail–which were addressed to Captain Martin, Sergeant Adams, and others–demanding that he be released.

82.     The grievances were all returned to him, stating that demanding to be released is not a grievable issue.

83.     During that week, his family called the Jail to ask why he had not been released. At different times, Jail staff told his family that they did not know why he had not been released and that they did not see him in the Jail system, although he was in fact detained in the Jail.

84.     Lively's family also called TDCJ to seek his release. They were told that TDCJ had approved his release, communicated that to the Jail, and it was up to the Jail to release him. A local pastor also called the Jail on Lively's behalf inquiring as to why he had not been released.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this case as a class action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure.

86.     The Class is defined as follows:

> All people, since July 11, 2021, until the date of the trial in this action, whose release from the Jail for a felony sentence was delayed beyond the amount of time reasonably necessary to timely process their release, excluding any

time during which TDCJ had received all necessary documentation to finalize release but had not yet finalized release. All Named Plaintiffs seek certification of this Class.

87.     The class members are readily ascertainable: the names and relevant records of the class members are in Defendant's possession.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

88.     On information and belief, the Damages Class includes dozens, if not hundreds, of members.

89.     Undersigned counsel have, through a sampling of public, Jail, and court records, identified ten people who were overdetained after appearing in Smith County District Court during just four months of the twenty-four month Class Period. *See supra* ¶¶ 49-51.

90.     This figure likely does not include all Class Members overdetained during the four-month period. But even if it did, it would mean, assuming this number reflects the average number of overdetentions during any four months in the Class period, that the County overdetained at least 60 people during the Class Period.

91.     Because joinder of sixty, and likely more, plaintiffs would be impracticable, the proposed class satisfies the numerosity requirement.

**Commonality: Fed. R. Civ. P. 23(a)(2)**

92.     Named Plaintiffs seek relief that is common to the Class and common questions of law and fact exist as to the Class. Plaintiff seeks relief for the County's policies and practices of

17

systematically overdetaining people in the Jail, which turns on a common question concerning whether such overdetention violates Class Members' constitutional rights.

93.     Common legal and factual questions arise from one central scheme: Defendant's ineffectual release policies and practices, which detain people in the Jail for more than six hours and up to weeks after they have completed their sentences.

94.     Resolution of common legal and factual issues will determine whether all of the Class Members are entitled to the relief that they seek. Among them are:

   a.  Whether the County maintains or maintained constitutionally adequate procedures to ensure that people in its custody are and were released within a reasonable time after the legal basis for their detention ended;

   b.  Whether the County maintains or maintained a policy and practice of detaining people for more than the amount of time reasonably necessary to timely process their release after the legal basis for their detention ends; and

   c.  Whether it violates the United Sates Constitution to detain people for beyond a reasonable time after the legal basis for their detention ends.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

95.     The Named Plaintiffs' claims are typical of the claims of the members of the Class, and they have the same interests in this case as all other members of the Class that they represent.

96.     The determination whether the County's ineffectual sentence and release processing policy and practice is unlawful in the ways alleged will determine the claims of the Named Plaintiffs and every other Class Member.

18

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

97.     Named Plaintiffs are capable of fairly and adequately protecting the interests of the Class because Named Plaintiffs do not have any interests antagonistic to the Class.

98.     There are no known conflicts of interest among Class Members, all of whom have a similar interest in vindicating the constitutional rights to which they are entitled.

99.     Plaintiffs' counsel are experienced in civil rights litigation and have successfully litigated a number of civil rights class action cases, including overdetention cases like this one.

**Predominance and Superiority: Fed. R. Civ. P. 23(b)(3)**

100.     Class treatment under Rule 23(b)(3) is appropriate because common questions of law and fact predominate over individual ones and a class action is the only practicable way—and, therefore, the superior way—of resolving this case.

101.     For the Named Plaintiffs, as well as for the members of the Class, this case turns on what the County's policies and practices are and on whether those policies are lawful.

102.     The common questions of law and fact listed above are dispositive questions in the case of every Class Member and will predominate over any individual questions.

103.     The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability, rather than individual suits by dozens or hundreds of Class Members, is a far superior method of determining the content and legality of the County's scheme.

104.     The question of damages will be driven by class-wide determinations of common questions. To the extent that individual damages will vary, they will vary depending on the amount of time the individual was overdetained.

19

105.    Determining damages for individual Class Members can be handled in a ministerial fashion based on the County's official electronic records, which will show the length of unlawful overdetention.

**CLAIM FOR RELIEF**

**Due Process**

**Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**

106.    Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs of this Complaint.

107.    Plaintiffs bring this claim on their own behalf and on behalf of a Class of similarly situated individuals against Defendant.

108.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution is violated where a person remains incarcerated after the legal authority to hold that person has expired. *See Douthit v. Jones*, 619 F.2d 527, 532 (5th Cir. 1980). No privilege enables a jailor to detain a person beyond the period of that person's lawful sentence. *See Whirl v. Kern*, 407 F.2d 781, 791 (5th Cir. 1968); *Powell v. Barrett*, 376 F. Supp. 2d 1340, 1351 (N.D. Ga. 2005) (detainees have a constitutional right to be free from continued detention after it was or should have been known that they were entitled to release).

109.    Defendant, acting under color of law, has and continues to enact a policy and practice of detaining people for days and weeks after the expiration of their sentences and the legal justification for their incarceration has ended.

20

110.    Defendant's unlawful policies and practices were the direct and proximate cause of Plaintiffs' illegal detention for eight to thirty-three days after the expiration of their sentences and the legal justification for their incarceration ended.

111.    Defendant's disjointed policies and practices relating to processing releases, including compiling and transmitting pen packets, are unreasonable, and Defendant has long been aware that they result in the unlawful and prolonged incarceration of people after the expiration of their sentences.

112.    In failing to adopt policies to prevent predictable overdetentions, Defendant acted with deliberate indifference in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

113.    Named Plaintiffs are entitled to monetary damages for themselves and the Class of similarly situated individuals.

## JURY DEMAND

114.    Plaintiffs demand a trial by jury in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed Class, demand a jury trial for all issues so appropriate and request that this Court order the following relief:

21

A.       Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing all Named Plaintiffs as representatives for the Class and undersigned counsel as Class Counsel;

B.       Enter a judgment compensating Plaintiffs and Class Members for the damages that they suffered as a result of Defendant's unconstitutional and unlawful conduct in an amount to be determined at trial;

C.       Award pre- and post-judgment interest as permitted by law; and

D.       Enter an order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 18 U.S.C. § 1964; and

E.       Grant such other and further relief as this Court deems just and proper.

DATED this 11th day of July 2023                      Respectfully Submitted,

/s/ Nathan Fennell
Texas Fair Defense Project
Nathan Fennell
Camilla Hsu*
314 E. Highland Mall Blvd #204
Austin, TX 78752
nfennell@fairdefense.org
chsu@fairdefense.org
512-637-5220

Akeeb Dami Animashaun**
355 S. Grand Ave, Suite 2450
Los Angeles, CA 90071
animashaun@pm.me
929-266-3971

*Application for admission forthcoming
***Pro hac vice* application forthcoming