PLAINTIFF'S
EXHIBIT

1
_____

# Jail Study

### Conducted for



### Submitted by



### September 27, 2022

# Table of Contents

                                                                          **Page #**

Introduction                                                                 2

Background                                                                   3

Jail Management and Staffing Structure                                       7

Employee Overtime                                                            16

Recruitment and Retention                                                    24

Jail Policies and Practices                                                  32

Jail Staff Training                                                          41

Appendix A – Mock Jail Inspection                                           46

Appendix B – List of Interviews                                             51

Appendix C – Summary of Recommendations and Fiscal Impacts                  53

# Introduction

Smith County engaged Griffith Moseley Johnson and Associates, Inc. ("GMJ"), a management consulting firm, to conduct a high-level assessment of the following components of its jail operations:

- Jail Management and Staffing Structure
- Employee Overtime
- Recruitment and Retention
- Jail Policies and Practices
- Jail Staff Training

Additionally, GMJ was tasked with conducting a mock jail compliance inspection, to assess minimum jail standards factors that are routinely inspected by the Texas Commission on Jail Standards (TCJS).

Over several months the GMJ consulting team conducted its work following its assessment methodology, including:

- A project initiation meeting
- A data request for elements needed to conduct quantitative analysis prior to conducting an on-site visit of the jail
- Pre-site visit analysis of data received
- Virtual stakeholder interviews and focus groups
- A mock jail inspection of the two facilities
- Tours of the two jail facilities to observe operations
- In-person stakeholder interviews

We conducted the mock jail inspection in March after having been postponed from February. Our team member conducting the inspection is a former TCJS inspector, so as to replicate an actual state inspection as closely as possible. The inspection took place prior to the consulting team's site visit to observe operations and conduct interviews. The report of the mock inspection is included with this report as Appendix A.

County personnel postponed the onsite visit twice for internal reasons. During this time, GMJ opted to begin conducting some stakeholder interviews and focus groups virtually, to attempt to avoid further delays in our project work. Some delays in project progress also occurred when certain requested data elements were not immediately forthcoming.

Our onsite work was conducted in March 2022. Once the onsite visit was completed the consulting team continued with its analysis in the months of March through May. The consulting team also conducted some supplemental interviews in June and made some additional data element requests, identified as needed during the site visit and subsequent analyses.

The following report presents our findings and recommendations for the Smith County jail operations.

## Background

Smith County was established in 1846 and includes 932 square miles. With a general population of 232,751, the county includes the cities of Arp, Bullard, Hide-a-way-Lake, Lindale, Noonday, New Chapel Hill, Overton, Troup, Tyler, Whitehouse, and Winona. With a population estimated to be 100,806, Tyler is the largest city and is also the county seat.

The county provides a full range of services as authorized by the Constitution and Statutes of the State of Texas. The primary functions include general government, justice system, law enforcement, jail, juvenile service, public transportation, public health, human services, and debt service.

Smith County is home to several major industries including manufacturing, health care, and higher education. There are 10 public independent school districts (ISD) in the county, as well as Tyler Junior College, the University of Texas at Tyler, Texas College, and UT Health Northeast. The county has experienced strong population growth due to its robust economy, with a population growth estimate of 13 percent since the 2010 census count.

In addition to the Smith County Sheriff's Office and the Smith County Constables, there are several other local law enforcement agencies operating within the county boundaries. These include the Arp Police Department (PD), Tyler PD, Troup PD, Bullard PD, Whitehouse PD, the University of Texas at Tyler PD, and the Tyler ISD PD, as well as multiple state and federal agencies.

Smith County houses inmates in two separate campuses:  the Central Jail, located at 206 E. Elm Street and the North Jail, which houses low and medium risk inmates, located at 2811 Public Road. The Smith County jail uses two different jail designs to manage the housing of inmates, the linear style and the podular design. Linear jail designs stretch inmate cells along hallways over an expansive area. Visual supervision is difficult due to the layout of linear style jails and, in the 1980s, jail architecture began a shift to a podular design to improve supervision. A podular direct observation design typically features a master control area in the center of a pod, with inmate cells and programming areas surrounding the perimeter in a circular or pie-shaped layout. Because the line of sight is better in a podular style layout, jail staff are not required to travel up and down long hallways to supervise inmates.

Smith County's Central Jail campus uses both linear style (bed capacity 286) and direct supervision (bed capacity 384) design, for a total of 680 beds. The North Jail inmate housing units are described as a podular design with direct observation, and a bed capacity of 432 beds.

There are 47 (decommissioned) beds at the courthouse not available for use.

The linear style has multiple-occupancy cells and dormitories aligned along corridors with intermittent indirect supervision. The podular design is used as a direct supervision model of inmate management. The direct supervision model places corrections officers' workstation

within the inmate housing units and provides constant interaction between staff and inmates, with the goal of reducing inmate conflicts and assaults, reducing inmate misconduct and disciplinary infractions. In jail best practices, the podular direct supervision design is widely accepted as the most effective and efficient means to supervise inmates.

According to the TCJS, the Smith County jail has a rated capacity of 1,149 beds and houses adult male and female offenders, and both pre-trial and sentenced inmates. Smith County also has a contract with the United States Marshal Service to house federal inmates, though the county stopped accepting federal inmates in March 2022 due to overcrowding issues. As of May 1, 2022, 47 local inmates were housed out of county to help alleviate the overcrowding issue.

General population inmates are classified as minimum, medium, or maximum-security custody levels. Minimum and maximum custody level inmates cannot be housed together. Male and female inmates cannot be housed together and must be separated by sight and sound but may simultaneously participate in work and program activities when under direct, visual and proximate supervision.

There are inmates housed at the Smith County jail that require special housing accommodations. For instance, some are placed in protective custody such as suicide watch, administrative, or disciplinary confinement.

The jail has an annual budget of almost $24 million. In fiscal year (FY) 2021, the jail had $22.8 million in total expenditures, $15.2 million, or 67 percent of which was for salaries and benefits for its 240 full-time equivalent (FTE) employees. The FY 2022 budget is $23.8 million, $16.6 million of which is allocated to salaries and benefits. The FY 2022 budget includes 240 FTEs, down from 258 in prior years due to the transfer of transport officers into another unit within the sheriff's office. At the time of the consulting team's site visit, the jail had between 28 to 30 vacant positions.

Figures 1 and 2 show the inmate population history for the jail for the past nine years. This data is based on one-day snapshot reports available from the TCJS. As these figures show, the population has increased by over 64 percent since 2014. The May 1, 2022 population report shows that the jail population is 1,009, in addition to 31 Smith County inmates housed in other counties due to capacity limitations.

**Figure 1. Smith County Total Inmate Population – Past Nine Years**

| County | May 2014 | May 2015 | May 2016 | May 2017 | May 2018 | May 2019 | May 2020 | May 2021 | May 2022 |
|---|---|---|---|---|---|---|---|---|---|
| **Smith** | 622 | 646 | 712 | 700 | 829 | 790 | 755 | 1,013 | 1,009 |

Source:  Texas Commission on Jail Standards, *Abbreviated Population Report* for the months indicated



**Figure 2. Smith County Total Inmate Population – Past Nine Years**

Source:  Texas Commission on Jail Standards, *Abbreviated Population Report* for the months indicated

Figures 3 and 4 show the county's incarceration rate. Incarceration rate measures the number of persons in jail per 1,000 county residents. Smith County's incarceration rate is about twice the rate as the overall state rate of incarceration. Figure 4 shows the history of the county's incarceration rate as compared to the state rate since 2014. The May 2022 rate of 4.27 is the highest the rate has been over the time period shown and is considerably higher than the 2.89 rate reported in 2016, the lowest of the time period shown. The Smith County rate has been consistently higher than the statewide rate, and over the years has increased more sharply than the state rate.



**Figure 3. Incarceration Rate for Smith County State – May 2022**

Source:  Texas Commission on Jail Standards, *Incarceration Rate Report* for May 2022

**Figure 4. Incarceration Rate Trend for Smith County Compared to State
May 1ˢᵗ Rates for the Years 2014 Through 2022**



Source:  Texas Commission on Jail Standards, *Incarceration Rate Report* for the months indicated

Figure 5 shows the percentage of the jail that is occupied compared to the statewide rate. The capacity rate is a measure of how crowded a jail is or not. The TCJS recommends a capacity of no more than 90 percent to allow for proper classification and housing of inmates. The Smith County rate of 88 percent is within the TCJS recommended threshold, but only because some inmates are housed in other counties. The Smith County rate is significantly higher than the statewide rate of 73 percent. If the 31 inmates housed in other counties were instead housed in the Smith County jail, the capacity would be 91 percent, exceeding the TCJS recommendation.

**Figure 5. Percent of Capacity for Smith County with Comparison to State
May 2022**

Source:  Texas Commission on Jail Standards, *Abbreviated Population Report* for May 2022

Figure 6 shows the make-up of the pretrial inmate population in jail. The 729 pretrial inmates in jail as of this reporting date represent 72 percent of the total jail population, just slightly higher than the statewide rate of 70 percent. Of these 729 inmates, 563, or 56 percent are awaiting trial on felony charges while 127, or 13 percent are awaiting trial on state jail felony charges. The pretrial misdemeanor inmate population in the county is 39 inmates, or 4 percent of the total population.

**Figure 6. Smith County Pretrial Inmate Population Compared to State May 2022**

| County | Pretrial 1-2-3 Felons | Pretrial 1-2-3 Felons Percent of Total | Pretrial Misd. | Pretrial Misd. Percent of Total | Pretrial SFJ | Pretrial SJF Percent of Total | Total Pretrial Inmates | Total Pretrial Percent of Total |
|---|---|---|---|---|---|---|---|---|
| Smith | 563 | 55.8% | 39 | 3.9% | 127 | 12.6% | 729 | 72.2% |
| State | 38,236 | 55.1% | 4,486 | 6.5% | 5,798 | 8.4% | 48,520 | 70.0% |

Source:  Texas Commission on Jail Standards, *Abbreviated Population Report* for May 2022

Figure 7 shows the county's convicted population. As of this reporting date, the county had 248 total convicted inmates which is 25 percent of the jail's population. In terms of percentage, this rate is more than double the statewide rate of 12 percent. Of these 248 inmates, 147 are convicted felons awaiting transfer to a state prison facility and 86 are convicted state jail felony inmates awaiting transfer to a state jail facility. Figure 7 also shows that in May 2022 the county had three inmates convicted of felony charges that were sentenced to county jail time, as well as one convicted state jail felon that was sentenced to serve time in the county jail.

**Figure 7. Smith County Convicted Inmate Population Compared to State May 2022**

| County | Convicted 1-2-3 Felons Sentenced to Prison | Convicted 1-2-3 Felons Sentenced to County Jail | Convicted Misd. | Convicted State Jail Felons Sentenced to County Jail Time | Convicted State Jail Felons Sentenced to State Jail Time | Total Convicted Inmates | Total Convicted Percent of Total |
|---|---|---|---|---|---|---|---|
| Smith | 147 | 3 | 11 | 1 | 86 | 248 | 25% |
| State | 5,749 | 441 | 820 | 259 | 1,344 | 8,613 | 12% |

Source:  Texas Commission on Jail Standards, *Abbreviated Population Report* for May 2022

## Jail Management and Staffing Structure

Smith County jail has a typical organizational structure. Its organizational chart displays the internal structure or hierarchy within the organization. It is a clear representation of different relationships amongst functions, departments, and positions. An organization chart for the jail is presented in Figure 8.

In addition to the positions shown in the chart, a training lieutenant and training officer who report under the law enforcement division of the sheriff's office are responsible for jail staff training programs.

**Figure 8. Smith County Jail Organization as of August 2022**



The employees of the Smith County jail are on a 14-day pay cycle for a total of 26 pay periods within the calendar year.

At the time of GMJ's review, the Smith County jail had a total of 240 authorized/funded positions. Of those positions, however, 56 are dedicated to support functions as shown in Figure 9.

**Figure 9. Smith County Jail Support Positions**

| Area | Number of Support Positions |
|---|---|
| Administration | 8 |
| Medical Transport | 1 |
| Staff Training | 1 |
| Classification | 11 |
| Support Services | 3 |
| Attorney Visitation | 2 |
| Compliance | 4 |
| Food Service | 9 |
| Transport | 13 |
| Work Crew | 3 |
| Estray Officer | 1 |

These 56 administrative/support positions work eight hours per day, five days per week, which is 10 days within the 14-day pay cycle.

This leaves 184 positions assigned to jail security, which includes inmate housing and booking. The booking area processes all intake and releases.

Operations of the Smith County jail are governed by the Texas Commission on Jail Standards, which requires an officer-to-inmate ratio of 1:48 for officers directly involved in supervising inmates (TCJS 275.4). Inmates held in the multiple holding tanks and the infirmary are not included in the rated capacity 1,149, as these are considered temporary areas.

The 184 positions assigned to inmate housing and booking work 12 hours per day and seven days within the 14-day pay cycle. These positions are spread over four shifts (two day shifts and two night shifts), with one day and one night shift working every 24-hour day. The four shifts rotate days on and days off within the 14-day pay cycle.

The four security shifts (A days, B days, A nights and B nights) have the following staff per shift between Central and North Jails:

**Day Shift Central Jail**
A & B Day Schedules – 24 total positions

**Night Shift Central Jail**
A & B Night Schedules – 22 total positions

**Day Shift North Jail**
A & B Day Schedules – 12 total positions

**Night Shift North Jail**
A & B Night Schedules– 11 total positions

The consulting team used staffing rosters, authorized staffing levels, jail overtime data, shift rosters with posts, support personnel and data on the average daily population to conduct staff assessments.

We are aware that the Smith County jail is outsourcing inmates to alleviate jail overcrowding. Outsourcing inmates should always be considered a temporary solution with a deadline to bring inmates back once the operational issues have been addressed.

**FINDING:**

**Smith County does not have 24/7 classification coverage to meet the needs of the jail.**

The book-in post/positions are on 12-hour shifts, as are most of the inmate supervision post/positions. The classification unit, however, operates on a modified eight-hour shift with coverage Monday through Sunday, from 8 a.m. through 5 p.m. and coverage on Tuesday through Saturday, 6 p.m. through 4 a.m. There is no coverage on Sundays and Mondays, after 5 p.m., and no coverage Tuesdays through Saturdays between 4 a.m. to 8 a.m. and between 5 p.m. to 6 p.m.

As is the case throughout the jail, staffing challenges have impacted the jail's ability to maintain full staffing in the booking area. As described to us during our onsite visit, the booking area would ideally be staffed with four officers, one each for intake, arrest, booking and photo. On the date of our site visit, the booking area was staffed by two officers, with a supervisory sergeant augmenting.

The staffing situation in booking is aggravated by the fact that maintaining the staff-to-inmate ratio for inmate supervision is the first priority when allocating insufficient staff resources. In addition, assignment to booking requires additional training beyond that which new officers receive, which limits the pool of officers eligible for that assignment.

There is no written curriculum or guidance for training new booking officers; all training is on the job. The current staffing situation makes it impossible to assign officers from the housing units to booking to learn the processes. An officer interested in learning the processes and enhancing his/her eligibility for an assignment in booking is expected to "put in some off-duty time," as one staff member explained to us.

At the time of our site visit, all of the holding cells were full, with inmates in some cases lying on mattresses on the floor. The booking officers appeared to be processing inmates as fast as they could, but the backlog was evident.

**RECOMMENDATION 1:**

**Establish 24/7 coverage in the classification unit.**

The Smith County jail needs to establish 24/7 coverage in the classification division to help with demands of timely classifying inmates. A staffing study as recommended later in this report will help to ensure the assigned staff is adequate based on current workload. There is currently only one classification officer assigned to nights.

**RECOMMENDATION 2:**

**Develop a written curriculum or guidance for training new booking officers and provide refresher training.**

We also recommend that classification officers receive yearly update and refresher training. The Smith County jail should establish a formal classification training program for new officers assigned to classification division to include standard operating procedures and a field training manual.

**FINDING:**

**The Intake and Admission policy does not provide written guidance on the booking portion of the process.**

The policy proceeds sequentially as an incoming prisoner would proceed through the process. It addresses security during admissions, including securing weapons and searching incoming prisoners. It requires jail staff to ensure commitment documents are appropriate.

The policy goes into detail on the process for intake and acceptance of inmate currency, as well as medical screening. It addresses fingerprints and photographs, clothing and bedding issue, orientation to jail rules and admitting the inmate to confinement.

The policy does not address the actual booking step in the process, during which the booking officer interviews the inmate to record personal and family information, physical description, vital statistics, offenses charged, and related information. One could generally rely on the policy to describe every step in the intake and admission process, except for the booking process itself.

**RECOMMENDATION 3:**

**Incorporate the procedural aspects of inmate booking into the agency's formal policy manual.**

**FINDING:**

**The policies and procedures manual does not address the classification process, and there is no written curriculum for training new classification officers.**

In reviewing the Jail Policies and Procedures, we located a statement in the general jail rules, Policy 100.3 (25), providing that, "The Classification Unit is responsible to the Assistant Jail Administrator and will follow the Jail Classification Scheme." We also located Policy 400.53, Inmate Classification Moves, which addresses classification and housing reassignments of inmates within the facility after admission. We could not locate any written guidance on the classification process itself.

We met with staff in the Classification Section and learned there is no written curriculum or guidance for training new classification officers; all training is on the job.

**RECOMMENDATION 4:**

**Incorporate the procedural aspects of the booking functions into a new classification policy.**

**FINDING:**

**The classification function is not adequately equipped, leading to delays in staff performing their responsibilities.**

The classification and booking functions are adjacent to one another, and the two sections share a single TCIC/NCIC terminal, which is located in the booking office. According to classification staff, if they are using the terminal when booking staff needs it, they are required to stop their work and defer to booking. Each section needs regular access to TCIC/NCIC to complete their work.

**RECOMMENDATION 5:**

**Install a dedicated TCIC/NCIC terminal in the classification section.**

Reliance on the terminal in booking and the required deference to booking staff has an adverse impact on the classification section's ability to complete its work. The jail should install an additional terminal.

We estimate that the fiscal impact of this recommendation will be approximately $3,000.

**FINDING:**

**The Smith County jail has not had a stable command staff for the past nine years.**

Over the past nine years there have been major changes in the chief deputy and captain (jail administrator) positions which also prompted movement at both the jail lieutenants and sergeant positions. The jail has had four different chief deputies and seven different captains in past nine years. These two key positions provide knowledge, experience and invaluable insight to the jail which is monumental to the overall success and stability of the jail division. The history of turnover in the chief deputy and captain positions is shown below.

- Chief Deputy F. Little, Chief of SO Admin and Jail  1/1/2013 - 1/31/2015

- Major D. Folmar 2/8/2015 - 10/31/2019

- Captain J. Shoemaker 1/1/2019 Chief Deputy 4/26/2020, demoted back to Lieutenant 11/21/2021 present

- Lieutenant T. Hughes      9/21/2014 to Captain 10/5/20214, left 7/10/2015

- Lieutenant R. Caraway  1/11/2015 to Captain 7/12/2015, left 12/31/2018

- Captain D. Coslin  11/1/2019 to Lieutenant, terminated 4/26/2020

- Captain W. Pharriss 6/15/2020 to Sgt.11/21/2021, left 4/1/2022

- Captain M. Martin, Assistant Jail Administrator  11/21/2021 – present

- Chief Deputy K. January, Jail Administrator  1/16/2022 – present

As a result of instability in these command level positions, the Smith County jail has been more susceptible to non-compliance with jail standards issues than in the past. The lack of defined leadership can also contribute to higher staff turnover. Stability is necessary for people to do their best work. The inability to provide direction to the team which may stem from leaders own lack of experience and/or vision and ability to clearly convey to employees the expectations can cause frustration on both the leadership and the officers. During times of change or uncertainty, stability is often shaken and can disrupt employees' ability to focus, adapt and thrive in the workplace.

**RECOMMENDATION 6:**

**Improve communications within the Smith County jail and require leadership training.**

The Smith County jail command staff must understand that it is their responsibility to both provide clear instruction to team members and help them see how their tasks contribute to the success of the organization's overall goals and objectives. Keeping staff informed of how their efforts impact the organization can motivate them to perform at their best while considering their own obligations. The downside to this is if it is not done successfully, it leaves doubt and instability in the workforce which will cause discord, excessive time off and eventually turn-over.

The Smith County Sheriff's Office must have qualified, capable, and stable staff in the chief deputy and captain's (jail administrator) positions. Good leaders know exactly where they stand in the organization and with their personnel. They leave no doubt with others as to what matters and what is and is not acceptable. Leadership is a vital management function that helps to direct an organization's resources to improve efficiency and the achievement of the overall goals of the organization. The Smith County jail needs leadership to provide clarity of purpose and to motivate and guide the organization to realize its mission.

The chief deputy should establish daily 7 a.m. 30-minute "kick off" huddles with members of his command staff (captain, lieutenants, classification sergeant, and shift sergeants). Huddles can be held virtually or by phone. The purpose of these huddles is to discuss the events of the past 24 hours, staffing challenges, classification updates, inmate incidents, and to identify any operational issues forthcoming. This will establish accountability and develop clear lines of communication and expectations. It will also build camaraderie and force leaders to take extreme ownership for their actions.

**RECOMMENDATION 7:**

**Implement leadership training for jail command staff.**

Members of the jail command staff should be required to take two leadership courses per year with focus on management, leadership, mentorship, communication, problem solving and conflict resolution. Instability in leadership trickles down and is a factor in staff retention and efficiency. It is also a factor in jail safety and security.

**FINDING:**

**Recent TCJS inspections revealed a significant number of deficiencies in the jail.**

A TCJS inspection conducted in March 2022 revealed that inmates were being housed in holding cells in excess of 48 hours. This same condition was observed during a GMJ mock inspection in February 2022 at which time administrative staff were present and made aware of the issue. Smith County was cited by TCJS during the March 2022 inspection for failing to properly staff the central jail. This was also a condition noted during the GMJ mock inspection. Other issues of non-compliance noted by TCJS were allowing a detention officer to work without a valid license, not offering showers to inmates on suicide watch and failure to use proper procedures with the restraint chair. A complete report on the consulting team's mock jail inspection is provided in Appendix A of this report.

The jail's organization chart (shown in Figure 8) shows two jail compliance officer positions, and the job description for the jail administrator lists jail compliance as one of the responsibilities of that position. However, when the consulting team requested procedures and documentation on jail compliance reporting, we received no reply from jail staff.

**RECOMMENDATION 8:**

**Establish a process for reviewing compliance in the jail.**

Effective jail operations must be constantly and consistently monitored. This is best accomplished with a compliance inspection team. The compliance team must be vigilant in their inspections and make timely reports of any deficiencies they find. The effect of doing so will help to identify non-compliance within the jail and correct any issues prior to TCJS inspections.

We recommend that the jail conduct a training session for its jail compliance staff based on the training that a TCJS inspector undergoes. The information covered in such training includes:

- Review of average jail population for the past 12 months along with reporting of any fires, deaths, suicides or escapes.
- Life safety inspections for documentation of staff participation in required quarterly air pack training and fire drills, monthly equipment checks of fire extinguishers, fire hoses, air packs and smoke detectors, required annual inspection of fire panels, weekly and monthly generator testing, quarterly fire prevention inspections, and annual fire marshal inspections.
- Food services to include annual health inspection of the kitchen, licensed dietician approval of menus, and fire suppression system inspections.
- Supervision and staffing to include required reporting of staff turnover percentage, documentation of staff observation of inmates, and audit for TCOLE certification of jailers, documented contraband searches, and facility staffing records to demonstrate a 1:48 staff to inmate ratio is always maintained.

- Sanitation checks.
- Discipline, incident and offense reporting.
- Complaints and grievances.
- Recreation logs to demonstrate inmates are afforded the opportunity for one hour of physical exercise at least three times per week.
- Facility operational plans.
- Annual commissary audit requirement.
- ADA plan and self-assessment practices.
- Population and paper ready reporting to TCJS.
- Audit of released inmate files.
- Classification audit.
- Initial classification training for staff with inmate classification responsibility.
- Review of current inmate classification files.
- Review of current inmate files for medical intake, screening, TB testing of employees and volunteers, TB testing of inmates, requirement for facility TB plan approval by Texas Department of State Health Services, suicide/mental health screening instrument proper utilization, verification of magistrate notification within 72 hour on any inmate suspected of having a mental illness history, review of sick call procedures, booking information, initial classification and reassessments, property inventory, inmate rules acknowledgement, criminal history requirements and Continuity of Care Query (CCQ) checks.
- Review of key points and areas inspected during a TCJS walk through inspection.
- Conducting an actual fire drill.
- Conducting an actual generator test.
- Inspections of court room and remote holding cells.
- Facility cleanliness.
- Inspection of fire panels.
- Inspection of standpipes.
- Interviewing staff and inmates.
- Inspections of toilets, lavatories, shower drains, tables, seating and bunks.
- Inspections of control room panels, intercoms, door controls, and fire panels.
- Inspections of lighting in cells, dayrooms, and hallways.
- Inspections of life safety equipment and fire panels during a generator test.

**FINDING:**

**Working 12-hour shifts can be taxing to an employee, both mentally and physically, on top of mandatory overtime.**

During focus groups and our onsite visit, staff shared with us their frustration of not being compensated with pay for working extra hours and then earning compensatory time, but not being able to take it.

Although some research shows that organizations who have implemented 12-hour shifts found concerns related with officers' morale, reduction of overtime costs were addressed in a fashion

that showed great benefits to the organization's budget. However, 12-hour shift schedules work best when an organization is fully staffed. When short staffed, 12-hour shifts can be detrimental because it takes more staff to cover all shifts.

**RECOMMENDATION 9:**

**Consider changing from 12-hour shifts to either 10-hour or eight-hour shifts to help with employee burnout which is contributing to turnover rates.**

Many Smith County employees report that they like the 12-hour shifts currently in place. However, working a 12-hour shift is difficult and may lead to the turnover issue. In addition, it can become a safety issue when employees, toward the end of their shifts, may be tired and not able to respond to issues with inmates as effectively as they should, especially when they are required to work overtime.

When the implementation of programs runs into an impediment such as stress, burn-out, inability to get days off and mandatory overtime routinely, the negatives outweigh the positives significantly. Some employees are not able to establish a balance between work and home life when required to work 12 hour shifts along with mandatory overtime.

The jail should consider implementing 10- or 8-hour shifts to help with employee morale and to ease the staffing shortage. As we discuss in the Recruitment and Retention section of this report, this will continue to be an issue in the Smith County jail, especially with the robust employment market in the area.

## Employee Overtime

The Smith County jail's current policy on overtime is to pay employees working on the jail floor or in the classification division time and a half for any hours worked more than 84 hours during a two-week time period. Once the jail's budget for overtime, which for fiscal year (FY) 2022 is $450,000, is expended, employees will no longer be paid overtime but instead will be given compensatory time (comp time). Comp time is similar to accrued vacation time; that is, the employee is allowed to take that time off at some point in the future. For every hour worked in excess of 84 hours within a two-week time period, the employee earns one and one-half hours of comp time. Current policy also requires that when an employee's accrued comp time balance reaches 480 hours, the county will pay the employee so that the comp time balance remains at 400 hours. When a jail employee leaves employment with the county, they are paid their comp time balance in full.

Prior to FY 2017, the county did not pay jail staff for overtime, instead providing them with future comp time. In 2017, the county started paying jail staff for overtime hours worked.

The new policy on paying overtime quickly led to escalating overtime costs as the chart in Figure 10 shows. The pandemic that started in 2020 contributed to these expenditures. In FY 2018, the jail exceeded the amount of overtime budgeted by $480,970, an overage of almost three times the amount budgeted. FY 2019 was similar, with an overage of $536,198. In 2020, the budget

was increased to $300,000 and overtime incurred was over $1 million, an overage of $719,020. In FY 2021, the jail exceeded its overtime budget of $450,000 by $1.1 million.

### Figure 10. Overtime Paid Compared to Budget
### FY 2019 through 2022*



Source:  Smith County Auditor's office, Budget-Expenditure report FY17-FY22

*Through January 2022. The county's fiscal year begins in October, and by January 2022, the jail had depleted its budgeted overtime. As a result, jail staff working in excess of 84 hours in a two-week time period are given accrued comp time in lieu of paid overtime subsequent to January 2022.

Beginning with FY 2022, the county changed its overtime policy of paying unlimited overtime. Instead, once the overtime budget is depleted, staff are compensated with comp time, with the same policy of "paying down" individual employees' comp time balances once they reach 480 hours, to 400 hours. For FY 2022, the overtime budget was fully expended within the first three months of the fiscal year.

To be fair, one cannot look at overtime spending in isolation. Due to the jail being short staffed for a long period of time, the county achieves a considerable amount of salary savings each year, or salary lag. This means that due to having so many vacant positions, the jail is not spending on salaries and benefits that it would have if the jail were fully staffed. When adding salary lag to the analysis of overtime, the county has achieved $406,144 in net savings for fiscal years 2019 through 2021 (net saving is calculated by taking total overtime paid during this time period and subtracting the amount of overtime paid). Figure 11 shows this comparison of overtime paid to the salary lag for the jail and shows how the savings amount is calculated.

If the jail was fully staffed, both overtime expenditures and salary savings would be reduced. That is, with a full complement of staffing, there would be fewer instances of requiring jail officers to work overtime to fill in for absences or vacancies, and the salary savings would no longer be accruing since all positions would be filled and getting paid.

**Figure 11. Overtime Paid Compared to Estimated Salary Savings**
**$ in Thousands**

| Fiscal Year | Overtime Paid | Salary Savings | Difference |
|---|---|---|---|
| 2019 | $701,198 | $607,026 | -$94,172 |
| 2020 | 1,019,020 | 1,176,318 | 157,298 |
| 2021 | 1,525,436 | 1,868,454 | 343,018 |
| Totals | $3,245,654 | $3,651,798 | $406,144 |

At the request of the Smith County sheriff in 2013, the TCJS conducted a staffing study for the jail. This study recommended a total of 256 FTEs, including transport officers. Taking out the 13 recommended FTEs for transport officers, the TCJS estimate is 243 FTEs.

The TCJS study looked at the staffing required to meet the one detention officer to 48 inmates ratio established in its minimum jail standards and used a relief factor of 1.63. Relief factor refers to the estimate of the number of hours (or days) required to fill a post during a given shift, when the person who is regularly assigned to that post on that shift is unavailable to fill that post because he or she is occupied elsewhere, either on annual leave, sick leave, attending training, attending to inmates in the hospital, etc. In our experience, the 1.63 relief factor used in the 2013 staffing study seems low and should be updated using current data.

The TCJS staffing studies focus on meeting the staffing minimums to meet the 1:48 ratio, and the relief factor used in the study is not calculated by TCJS but rather is dependent on data submitted by the county. The TCJS studies do not analyze the data used to calculate the relief factor.

To demonstrate how critical a proper relief factor is for proper shift coverage, we tallied the documented number of hours that jail employees spent away from work for the past two fiscal years. The data in Figure 12 shows a summary of the hours of leave taken, both paid and unpaid, by jail staff for fiscal years 2020 and 2021. The total hours not worked in 2022 was 33,611 hours, an increase of 15 percent from 2021 when there were 29,362 unworked hours. These hours do not reflect the amount of time employees are at work, but away from their posts such as having to deal with an inmate problem or having to take an inmate to the hospital or a medical appointment.

**Figure 12. Total Hours Away from Work**

| | Number of Hours | | |
| --- | --- | --- | --- |
| | **FY 2021** | **FY 2022** | **Incr/(Decr)** |
| *Paid time off* | | | |
| Administrative day leave | 496 | 528 | 32 |
| Administrative leave | 11,730 | 3,723 | (8,007) |
| FMLA sick leave* | 1,766 | 2,796 | 1,030 |
| FMLA vacation leave* | 514 | 678 | 164 |
| HB2073 quarantine leave | - | 5,649 | 5,649 |
| Military leave | 1,096 | 1,657 | 561 |
| Sick leave | 4,491 | 6,482 | 1,991 |
| Vacation leave | 8,400 | 9,623 | 1,223 |
| Subtotal | 28,493 | 31,136 | 2,643 |
| *Unpaid time off* | | | |
| Dock | 392 | 2,075 | 1,683 |
| FMLA dock | 477 | 400 | (77) |
| Subtotal | 869 | 2,475 | 1,606 |
| Total documented hours off | 29,362 | 33,611 | 4,249 |

*county policy requires employees to use vacation and sick leave balances for FMLA leave

**FINDING:**

**There are several factors contributing to Smith County's excessive overtime, and until addressed, overtime will continue to be an issue for the county.**

One of the first steps we take when analyzing overtime is to look at payroll policies and practices to identify potential reasons for the overtime. In this case, the county has already taken steps to ensure that timekeeping and reporting practices are sound, including conducting an internal audit of the issue. The audit identified several deficiencies such as overtime being paid based on the hours an employee was scheduled to work versus the number of hours actually worked and employees working more overtime than allowed by working at two different jail facilities under different supervisors which allowed them to exceed the allowable number of hours. It should be noted, however, that the employees exceeding the allowable number of hours of overtime were filling in for shifts to maintain a 1:45 staffing ratio as required by TCJS.

Following the release of the internal audit, policy changes as well as additional controls in the timekeeping system were implemented.

Our review found that a primary reason for incurring excessive overtime is the lack of staff on any given day, which only worsened with the onset of the pandemic in 2020.

The jail's employee retention issue is contributing to the high amount of overtime worked, and conversely, the high amount of overtime worked is contributing to the employee retention issue.

It has been nine years since the TCJS prepared its minimum staffing calculation and the jail now holds almost 400 more inmates than it did in 2013. The jail, at the time of our site visit, was staffed with 240 FTEs, three fewer than what TCJS recommended using the 1.63 relief factor. In addition, of these 240 positions (as of the time of our review), only 184 are detention officer positions. Considering that we feel the relief factor is grossly understated, we consider the jail to be severely understaffed. Without properly addressing the staffing issue, the county will continue to incur excessive overtime and comp time, as well as face employee turnover due to burn out on the job.

Another contributing factor is the dramatic increase in the jail's population. Over the course of just a few years, the population has almost doubled. As of April 2022, the county stopped accepting federal inmates to help ease the inmate population issue, as well as ceasing to book Class C misdemeanor arrestees. Until this change was made, the county held between 30 and 40 inmates under a contract with the U.S. Marshals Service. The county also contracts with other counties to hold some of their inmates. As of the May 1 TCJS snapshot, Smith County had 31 inmates housed elsewhere in the state.

The slowdown in court case proceedings has also impacted the jail population since jury trials could not be held due to the pandemic. The county is just now starting to address its backlog of court cases, while all along these defendants have been held in the jail.

Even though the county offers pretrial release to qualified defendants, it appears that more individuals in jail could be released on pretrial bond. The consulting team heard anecdotal information about the high bond amounts for low level offenses, and a review of bond amounts for those out on pretrial release appears to confirm this information.

The consulting team also found that the county uses monitoring devices such as electronic monitoring (ELM) that track a defendant's whereabouts while out on bond and ignition interlock devices (IID) for those out on bond while awaiting trial for DWI/DUI charges. Through discussions with pretrial and adult probation staff, we found that IIDs are used to monitor pretrial defendants in the county, but it appears that the county could make greater use of ELM for pretrial defendants, further reducing the inmate population while still balancing public safety concerns.

We also learned during our site visit that the Texas Department of Criminal Justice (TDCJ) reported that the county has not been submitting complete penitentiary (pen) packets for those convicted inmates awaiting transfer to TDCJ. Section 8(a), Article 42.09 of the Texas Code of Criminal Procedure details the information that is to be included in an inmate's pen packet and the TDCJ cannot accept an inmate until his or her pen packet is complete. An inmate whose pen packet is complete and is ready to transfer to TDCJ is considered "paper ready."

Per the Code of Criminal Procedure, key components of a pen packet include:

- copy of defendant's judgement
- amounts the defendant owes in restitution, fines, and court costs

- a written report that states the nature and the seriousness of each offense and that states the citation to the provision or provisions of the Penal Code or other law under which the defendant was convicted
- copy of the victim impact statement
- criminal history of defendant
- copy of the indictment for each offense for which the defendant has been convicted
- report on the defendant's health status
- copy of the defendant's mental health records, mental health screening, or other information related to the mental health of the defendant

The paper-ready process requires cooperation among all components of the justice system, including the district attorney's office, sheriff's office, jail, judiciary, and the district clerk's office.

There have been efforts across Smith County agencies to go all-electronic on records, which would expedite the pen packet process, but we understand that due to a lack of consensus among county departments on whether to use electronic records, these efforts have been stalled. Other counties using electronic records have demonstrated that doing so helps to expedite the paper ready process, which in turn results in inmates being transferred out of county jails faster.

Slowdowns in this process have a direct impact on inmate population and saddle the county with the expense of housing inmates that could have been transferred to TDCJ. The sooner the county can prepare and submit an inmate's pen packet, the sooner that inmate can be transferred out of the county jail, thus lowering the inmate population as well as the county's costs to house inmates.

Subsequent to our site visit the sheriff informed the consultant team that efforts have been made to improve the process for preparing inmate pen packets. The new process involves the use of electronic records to process the pen packets rather than the manual process which required inmate paperwork to be physically carried throughout the justice system.

Combined, all these factors have had a negative impact on staffing, which has led to a high employee turnover rate, with has led to incurring high levels of overtime and comp time.

**RECOMMENDATION 10:**

**Conduct a staffing analysis to include determination of a relief factor for the Smith County jail.**

The county should conduct a detailed staffing study to determine a proper relief factor for the jail. Having a properly staffed jail will help to reduce the amount of overtime employees are required to work, which will help relieve the turnover issue as well as reduce overtime and comp time expenditures.

Having the proper relief factor is vital to successful jail operations because jails operate every hour of the year and each post within the jail that requires inmate supervision must be properly

staffed to maintain compliance with the TCJS-mandated 1:48 minimum staffing ratio. Smith County jail overtime is being driven by its 28 to 30 vacant positions.

Positions dedicated to the supervision of inmates are staffed by detention officers or deputies for 12 hours, requiring two shifts to cover a 24-hour period. Therefore, each post requires 4,380 hours (12 x 365) of coverage per shift. As an example, the average attendance rate for a fulltime employee is approximately 1,801 hours per year. That equates to 2.4 FTEs per 12-hour shift, (2 x 2.4) which requires 4.8 FTEs per dedicated post. This accounting, however, does not include unexpected absences from work or situations where detention officers are pulled away from their post to attend to other areas in the jail, in which cases the number of FTEs per dedicated post would calculate to be more than 4.8.

The county can expect to spend approximately $80,000, depending on the scope, for a detailed staffing study that includes a calculation of a reliable relief factor.

## RECOMMENDATION 11:

**Conduct an assessment of the county's pretrial services functions to determine if more inmates could be released from the jail while awaiting trial.**

The county should immediately look at its pretrial release policies and practices and focus on providing pretrial bonds for those low-level offenders without violent criminal histories. The county already has pretrial services units in place, so this is a matter of looking at its policies and developing a workable alternative.

The county should review the inmates currently in jail, with particular focus on those who have been in jail the longest, to determine if there are defendants who would be good candidates for early release. In addition, the county should focus on the speed at which pretrial inmates are released from jail. The sooner an eligible inmate is released, the sooner the jail staff are relieved of being responsible for that inmate.

## RECOMMENDATION 12:

**Increase the alternatives available to defendants that allow them to be released from jail while awaiting adjudication.**

The county should also investigate more alternatives to incarceration including adding a mental health court (the county currently operates a drug court and a veteran court) and allowing more people to bond out while awaiting adjudication. Increasing the use of electronic monitoring (ELM) that allow defendants to continue to work and attend to their families will help to reduce the jail population as well as help to hold those out on bond to be accountable while awaiting trial.

The use of ELM is a best practice in the use of alternatives to incarceration. Counties that use ELM to monitor individuals given pretrial release find it is an effective and safe way to monitor defendants. Because counties that use ELM can require the defendant to pay fees for the use of the devices, the cost to the county for using these devices is low.

The implementation of mental health courts is another best practice that counties have found to help keep those with mental health issues out of jail. Many counties assign mental health cases to a judge who already works in the county and build associations with mental health resources in the county or in the region to provide services to defendants with mental health issues.

**RECOMMENDATION 13:**

**Conduct a review of how long, on average, it is taking for inmates to become paper ready. If the average time to paper-ready is more than seven days, the county should conduct a detailed review to determine how to improve the process.**

We understand the county is using Tyler Technologies criminal justice management software systems that has modules available to assist in the paper ready process. The county should assess its systems or contact Tyler Technologies directly to determine whether its current system has these modules in place, and if not, the county should add them.

The county should assign an individual to be responsible for the oversight of the paper ready process. This individual should report on a regular basis to the jail captain, sheriff, and county judge on the amount of time it takes, on average, to get inmates paper ready. This individual should also be tasked with coordinating with each of the county departments that have a role in submitting information or paperwork that is included in an inmate's pen packet and to help build consensus on ways to streamline the process.

The consulting team has identified a best practice for improving the paper ready process. Counties that review the paper ready process and monitor the average number of days to get an inmate's pen packet complete are able to speed up this process significantly. One of our former clients went from 20 days on average to five days by doing so. The first step towards making improvement is to measure the average number of days and then to identify where delays are occurring.

**FINDING:**

**The financial cost of attrition may outweigh the use of compensatory time.**

Costs associated with training, licensing, uniforms and equipment are all part of hiring a new detention officer. With the current high rate of attrition, Smith County is making significant financial and time investments with negligible return on the investment.

**RECOMMENDATION 14:**

**Examine the costs involved with training and equipping newly hired employees and paying them overtime compared to the costs of attrition.**

Smith County should examine the costs involved with training and equipping a newly hired employee. According to data provided by the Association for Talent Development, the average training cost per employee is $1,252. This is a national average and is not specific to corrections. When factors such as the cost of uniforms, equipment, training officers' time, and attending the

required Basic County Corrections course are factored in, it is likely that the training cost for new jail employees is closer to $2,500. The average turnover rate in the Smith County jail was 2.3 percent in 2021 which means an average loss of five employees per month. This attrition comes at a cost of $12,500 per month to Smith County. When an employee's comp time balance reaches 480 hours it is paid down to a balance of 400 hours. This payoff may be less than the monthly cost of attrition of $12,500; however, it is never ending and will always be a payroll liability for the county. Smith County's system of awarding compensatory time for overtime worked is frequently cited as a driving force in employee attrition. When the employee resigns, Smith County must pay out any accrued compensatory time balance. For employees with 400 hours of comp time accrued at the time of leaving employment with the county, this is equivalent to 10 weeks of pay. Being understaffed and having employees not able to use accumulated comp time works as a disincentive for remaining employed. The county should examine these costs and transition away from compensatory time in favor of paid overtime.

The fiscal implication of this recommendation may be cost neutral since it is assumed that having a fully staffed jail with an adequate relief factor will reduce the need for employees to work excessive overtime or comp time.

## Recruitment and Retention

At the time of this review, the Smith County jail had 240 full-time equivalent employees; however, the jail has struggled in the past few years to retain enough employees to be fully staffed. At the time of our site visit, the jail was short between 28 to 30 staff members.

The county has made a significant effort to improve recruiting for jail staff over the past five to six years. During interviews with stakeholders from the jail and the county's human resources division, the consulting team learned of recruitment strategies targeted at students graduating from high school, for whom jail employment might be deemed attractive while they are attending college, many still living at home, and possibly looking at careers in criminal justice. In FY 22, the county also increased the salary for detention officers by 14 percent over the prior year in order to better compete with other area employers. Starting salaries for detention officers increased from $33,620 to $41,500 annually. To bring recruitment tools currently used by job seekers up to date the county also began employing the use of social media (Facebook, Instagram, indeed.com), to link to the county's job postings. Once posted on the county's website the positions are linked to indeed.com within four hours. They also link to the sheriff's website. The county also used a video producer with experience in communication algorithms to mine data so the openings would pop up to persons having been searching online.

Records show that between January 1, 2017 and December 26, 2021, the Smith County jail hired 605 employees. Taking into consideration that there are 240 budgeted positions in the jail, with 55 of those position being support positions, this leaves 185 line staff. The hiring of 605 employees during this time essentially means that in this time period the county has hired enough jail employees to staff the jail between two and three times over. Yet even at the time of the

consulting team's site visit, the jail had between 28 to 30 vacancies. Data reviewed at the time of our engagement show that the vacancy rate for jail staff nearly doubled from 2020 to 2021.

One view of recruitment and the sheer numbers hired can lead to the belief that recruitment strategies have been successful. Yet, as the numbers show, the retention of these hires is not sufficient to maintain a full complement of staff and consideration of recruitment strategies that may result in better personnel retention is in order. One opinion regarding detention officer recruitment is that the position is not one deemed to be a career, but rather a steppingstone for other justice and law enforcement careers, and that retention will always be a concern. Even taking this view and accepting that some retention issues will always exist, the sheer rate of attrition and low retention in the jail reveal that volume recruitment and hiring alone is not yielding satisfactory results for the county and creating ongoing operational problems for the jail.

Another indicator that recruitment is not yielding adequate retention is the number of detention officers operating on temporary jailer licenses. A review of 206 Smith County jail staff showed that 56 staff members (27 percent) were operating on temporary jailer licenses. This data indicates that while Smith County continues to recruit and employee new detention officers, the hiring has not kept pace with the attrition. Detention officers operating on temporary licenses result in personnel who are not fully trained and experienced, again with the potential for increased operational concerns. A stable work force is necessary for an efficiently operated jail.

**FINDING:**

**A review of the video used for detention officer recruitment may lead to applicants who are seeking a different type of employment.**

The recruiting video shared with the consulting team is a well-produced, action packed, exciting enticement for *law enforcement officer* activities. This is not unusual for jail operations seeking to hire candidates for detention officer positions. However, young persons who are not knowledgeable of jail operations can believe they will be working in a different type of environment than the one that is the day-to-day reality of a detention officer. Once in the true environment, it can be found to not meet expectations and be a fit, leading many to seek alternative employment in short order.

Detention officer positions are often seen as a steppingstone for young people seeking a career in law enforcement, with a goal to move into the patrol side of a sheriff's office or to another police department.

**RECOMMENDATION 15:**

**Use the interest in detention officer positions as a "steppingstone" to other law enforcement careers as an incentive for detention officer positions.**

The county should establish a system by which employees who complete their full detention officer training and obtain their jailer's license could commit to remain in their detention officer position for a period of time (such as four or five years) in return for weighted priority to be given when patrol or law enforcement positions become available if they are interested (or, for

attending a law enforcement academy). Incentivizing longer tenures in detention officer positions could encourage officers to remain in their positions for a longer period of time.

The recruiting video should be supplemented to illustrated routine duties of a detention officer in the jail. The objective here is to present an overview of the everyday working conditions new jailers can expect to encounter while working in the jail, using the video to highlight the "steppingstone" aspects of starting as a detention officer and advancing to other law enforcement careers. Any current practices which Smith County uses to incentivize longer tenure in the jail should be highlighted in the recruiting video as well.

**FINDING:**

**The jail staff vacancy rate in Smith County has increased dramatically over the past three years. The current trend indicates this vacancy rate will continue to increase.**

Since 2019, the average vacancy rate for jail staff has increased from 6 percent to 15.8 percent in 2021. During this same period, the average staff turnover rate has remained relatively constant, 1.7 percent in 2019 to 2.3 percent in 2021. Vacant staff positions must be filled to meet staffing ratios mandated by the TCJS. Existing staff are required to work overtime in order to fill vacant positions. An increase in vacant staff positions leads to an increase in overtime shifts. A comparative of the three-year trend for staff turnover and vacancies is illustrated below in Figure 13.



**Figure 13. Smith County Jail Turnover and Vacancy Rates 2019 - 2021**

Source: Smith County Licensed Jailer Turnover Reports 2019 -2021; Texas Commission on Jail Standards

The average annual staff turnover in the Smith County jail has remained relatively constant over the past three years while the average staff vacancy rate has increased by nearly 10 percent since 2019. It is noteworthy that a review of 206 Smith County jail staff training records indicates 56 staff members (27 percent) with a temporary jailer license. Employees working with a temporary license are those with 12 months of service or less who have not completed Texas Commission on Law Enforcement (TCOLE) requirements for permanent jailer license. These requirements include completion of the Basic County Corrections course (TCOLE #1120) and successfully

passing a state exam. Detention officers working with a temporary license are typically not allowed to work the jail floor unless supervised by a staff member with a permanent license.

The TCJS reviews staff turnover and vacancy rate on a monthly basis. Higher turnover and vacancy rates are considered risk factors for a jail falling into non-compliance with TCJS.

Figure 14 shows a three-year comparative of the Smith County jail average annual turnover rate with the state average annual turnover rate for the same time period (2019 – 2021)

**Figure 14. Smith County Jail Turnover Rate:  Local vs. State Average 2019 - 2021**



Source: Smith County Licensed Jailer Turnover Reports 2019 -2021; Texas Commission on Jail Standards

**RECOMMENDATION 16:**

**Implement training programs and provide part-time employment opportunities to improve employee retention.**

New employee orientation is a critical first step in improving retention. This is a separate function from induction paperwork typically handled by a human resource department. Orientation should begin with determining employee expectations. With an understanding of expectations, the new employee can be shown how they bring benefit to the organization. Ideally, this would be a function of the detention training officer, more commonly referred to as field training officer (FTO) and tools used to improve orientation may include video trainings, one-on-one discussions with the FTO, communication with fellow employees, and group meetings to encourage organizational teaming.

Positive supervisory-employee relations have a significant role in employee retention. A supervisor who displays concern for the employee and uses good communication can influence an employee's decision of whether to stay on the job. Training supervisors on how to work with employees often pays big dividends when it comes to employee retention. Encouraging first line

supervisors to care about their employees may be a practical, inexpensive, and simple way of retaining staff.

Work environment is an important consideration to examine when looking to improve employee retention. As reported to the consulting team through staff interviews and focus groups, the current 12-hour shift schedules used in the Smith County jail are beneficial and attractive to many employees but is a hindrance to others due to the long hours. The county should explore a part-time employee program option for those unable to work a 12-hour shift. Under a part-time employment program, employees would still need to be fully licensed and trained as jailers but may only work a six-hour shift or be available to be called in as needed, depending on individual circumstance. A part-time employee program would afford greater flexibility to both the administration and employees, which could potentially improve turnover rates for those employees who are unable to work a 12-hour shift.

**FINDING:**

**Smith County has a low unemployment rate, making recruitment even more challenging.**

According to the U.S. Bureau of Labor Statistics, the unemployment rate for Smith County in May 2022 was 3.5 percent while the statewide average was 4.2 percent. This data indicates a fairly saturated job market in Smith County which limits the potential applicant pool. Additional challenges to recruitment include the fact that the Texas Department of Criminal Justice (TDCJ) recently awarded a 15 percent pay increase to employees in addition to retention bonuses which provide for an annual salary of $51,000 after six years employment. The tight labor market in Smith County and competitive salary from an agency as large as TDCJ will continue to make recruitment extremely challenging.

The county pay scale for detention officers is structured to award base salary increases for each level of TCOLE advancement, as well as base salary advancements based on years of service.  However, there is no incentive structure in place to encourage employees to remain in their positions during their first two years of service, which is the time period during which the county sees significant turnover.

**RECOMMENDATION 17:**

**Consider implementing a bonus program to incentivize longevity among jail staff.**

The county should consider implementing a bonus program for new hires, with bonuses available at specific milestones early in a trainee's tenure. Examples of milestones include:

- completion of detention training
- completion of jail school
- completion of probationary period

- completion of time on the job, with bonuses received at one year, two years, and three years on the job, with each successive year the bonus getting higher.

Each milestone bonus can range from $500 to $2,000, depending on the milestone reached. Smith County must maintain a salary range competitive to other employers and milestone incentives are one way of encouraging longevity.

With the unemployment rate as low as it is in the Smith County area, and with industries with competitive salaries, the county needs to find ways to remain attractive to new employees entering the jail system.

We estimate that it will initially cost the county $240,000 to implement this recommendation. We arrived at this estimate by assuming that in the course of one year the county will hire 80 new detention officers. With an estimated total bonus (for all established milestones) of $3,000, this equates to $240,000 (80 officers X $3,000 total bonus).

However, once employee retention improves, the amount of overtime and comp time saved will help to pay for this bonus program.

**FINDING:**

**Smith County does not have a written policy for promotion procedures for sergeants.**

Sergeants are the most critical position in any agency for a number of reasons. As outlined in "Promoting Excellence in First Line Supervision," published by the Police Executive Research Forum, this also holds true for correctional sergeants for a number of reasons:

- Sergeants supervise 85 percent of agency personnel. According to 2013 Law Enforcement Management and Administrative Statistics, 7 percent of all sworn personnel are sergeants or equivalents. They are the first line supervisors to 85 percent of the law enforcement workforce.

- Sergeants are the "eyes and ears" on the officers. The sergeants see and hear what the line staff are saying and doing. In this aspect of their job, the sergeants serve as an agency's early warning system to detect any organizational issues and problems.

- Sergeants train and mentor line detention staff. This is true not only in the classroom or roll call but on a daily basis with on-the-job training. Training occurs when dealing with problem incidents and the debriefing which should occur after a situation has been handled.

- Sergeants can make or break new policies. A sergeant's words and actions have a strong impact on the attitudes of the majority of agency personnel.

**RECOMMENDATION 18:**

**Implement written policies and procedures for promotion to sergeant.**

Many agencies are moving away from written promotional exams in favor of assessment centers and oral boards to give them a more comprehensive view of promotional candidates. Smith County should implement a robust training program for sergeants to exceed the state mandated training. The state mandated training for new first line supervisors is regulated by TCOLE and must be completed within the first year of appointment as a supervisor. The training can be completed in a classroom setting or online. In addition to this mandated basic supervisory training, newly promoted sergeants should attend leadership centered training such as Mid-Management: Leadership for Corrections Professionals or the National Jail Leadership Command Academy. Both of these programs are available through the Correctional Management Institute of Texas at Sam Houston State University.

**FINDING:**

**A significant number of staff turnover is among employees with 12 months or less on the job.**

Monthly staff turnover reports submitted to TCJS indicate the majority of staff who leave employment are those with 12 months experience or less. In 2020, a total of 76 new employees were hired while 71 were hired in 2021. Both years saw a turnover rate of more than 2 percent.

**RECOMMENDATION 19:**

**Review the detention training program for new employees. A robust and comprehensive training program may reduce the amount of attrition among newly hired employees.**

Attrition among the most recently hired employees is not uncommon; however, Smith County should implement measures to reduce the turnover rate among this segment of employees. Using the field training officer (FTO) program in a mentorship capacity to encourage communication and documented feedback between the FTO and trainees would provide an early warning system regarding employees who are struggling and/or contemplating leaving employment. With the enlistment of the sergeants to assist in the support and encouragement of such employees a potential for reduced attrition may exist. This method would address employee morale and satisfaction much earlier on.

A strong training program provides the new employee with the knowledge and self-confidence to perform their job with competence. Training is often cited as a means to improve employee retention. Given the high turnover rate and large number of newly hired employees, training is one of the most critical aspects of jail operations. Smith County should review their existing program. This may best be accomplished through the formation of a training committee in order to divide the various areas of responsibility in a task of this size. Several resources are available

to provide guidance, including "Strategies to Implement and to Improve Jail Correctional Training Officer Programs." [1]

**FINDING:**

**Smith County has seen a dramatic rise in vacancies, and in staff turnover.**

Records show between January 1, 2017, and December 26, 2021, the Smith County jail hired 605 employees, yet still had 28 to 30 vacancies at the time of our site visit. There are only 240 budgeted positions, 55 of which are support positions**.** This confirms that the loss of jail staff is at an all-time high. Moreover, rapid turnover is making it nearly impossible for jail administrators to provide an experienced and cost-effective inmate supervision program. The review of material related to staff turnover revealed several important issues.

- Staff turnover is on the rise and the cost of replacing these trained employees is growing.

- Jail populations are escalating, contributing to the problems associated with recruitment and retention of staff.

- The labor market is getting tighter in the corrections field.

- The cost of covering overtime and compensatory time earned is expensive to the county.

**RECOMMENDATION 20:**

**Encourage career development for jail staff.**

Smith County should offer incentives for career development through training and certification for staff. Such a program is available through the American Jail Association (AJA) Certified Jail Officer program. This is a program for front-line officers whereby they are tested by AJA for knowledge of jail operations, safety and security, professional and legal concepts, special populations and support services. According to AJA it not only elevates professional standards of jail operations by indicating that the individual has the proper job experience and body of knowledge, but also encourages continuing education, professional growth, and a commitment to continue working in the local corrections profession. Recognition for the employee's attainment of this certification can be made in the form of uniform pins or insignia and additional financial compensation. Certification of this type encourages staff training, proficiency and professionalism.

**FINDING:**

**The county is not gathering enough information regarding reasons for jail staff turnover.**

When a jail staff employee resigns, the county human resources department provides the opportunity for the employee to complete an optional, online exit survey. These surveys, when

---

[1] http://www.cipp.org/uploads/3/7/5/7/37578255/cippjanuary2020jtp.pdf

completed, yield some themes and at times consistent information about why staff leave their employment. On the sheriff's office side, the departing employee is scheduled with an exit interview when the employee gives their notice, but it is up to the individual employee to choose whether to attend the interview. During interviews with jail personnel the consulting team was told that this is a time when they can attempt to change the person's mind about resigning. These tools and efforts at exit interviews and surveys are admirable but occur far too late to have a positive impact on retention. By the time someone gives notice of separating from their employment, they either have another job lined up or have otherwise made a firm decision that they no longer wish to work at the jail.

**RECOMMENDATION 21:**

**Implement the use of periodic employee satisfaction surveys.**

The county human resources office and the sheriff's office should work jointly to capture information far earlier, during staff's active employment, to capture data on employee satisfaction and areas of improvement needed that can result in increased staff longevity.

Establish a system of quarterly online, anonymous employee satisfaction surveys to gather data that can assess needed job site improvements for employee retention. Housing the survey with the county human resources office will give employees the added sense of its anonymity and a likely greater comfort level in responding. The human resources office would tabulate and generate the reports and share them with the jail command staff, for their analysis and attention to employee satisfaction workplace needs.

## Jail Policies and Practices

The consulting team reviewed the jail's policy manual, a lengthy document of almost 300 pages. The document covers a variety of procedures, including requirements for detention officers and how to handle inmate issues. We conducted a detailed review of the policy document following our site visit in light of interviews with staff, the practices we observed and those that were described to us.

We reviewed specific policies and procedures that related to jail practices:

- Management of inmate intake
- Documentation management
- Inmate complaint and response processes
- Employee complaint and resolution processes
- Mental health documentation
- Medication administration
- Medical treatment practices
- Attorney visitation practices
- Court interface practices

We also reviewed "informal" policies and procedures that were documented through memorandums and emails but were not a part of the policy manual.

We understand employees do not receive a physical copy of the manual, but the document is made available to all staff in a PDF format online.

**FINDING:**

**The Detention Division Policies and Procedures Manual lacks a clear and logical structure.**

Our initial observation is that the Detention Division Policies and Procedures Manual is a compilation of rules, regulations, policies and procedures, that appears to have been compiled over a period of years from a variety of sources. The first 74 pages appear to be selected excerpts from a separate law enforcement policy manual.

The numbering convention is non-sequential, beginning with Policy 2.05, with no explanation as to the absence of Policies 1.0 to 2.4. Immediately following Policy 2.05 is Policy 2.12, again, with no explanation as to the absence of Policies 2.06 to 2.11. This non-sequential numbering continues with large gaps throughout the manual.

Apart from the first 74 pages, the manual is organized into five sections, numbered 100, 200, 300, 400 and 700. The sections are not titled and, with the exception of section 700, which addresses some procedural aspects of managing the direct supervision housing units, they are not organized by topic area.

As a result of the practice of implementing policy and procedure by memo, email and shift meeting briefings, it appears there exists a body of policy and procedure beyond the pages of the Policies and Procedures document made available to employees online.

It also appears there is no standardized process for incorporating those new policies into the Policies and Procedures document. No one could direct us to a document or resource where we could access and review the body of policies and procedures implemented by memo and email. This raises question as to whether staff is able to access those policies and procedures.

**RECOMMENDATION 22:**

**Form a working group to overhaul the policy manual and organize policies and procedures into a logical sequence.**

Given the extent of our findings and the deficiencies, gaps and inconsistencies identified in policies and procedures manual, we recommend the formation of a working group for a complete review and revision of the policies and procedures manual. The National Institute of Corrections (NIC) resource on developing and updating detention facility policies and procedures is an excellent resource to facilitate this work.

This working group should be made up of line, supervisory, and command staff.

In addition, related policies and procedures should be grouped together. A sequential numbering convention by major topic should be adopted.

**FINDING:**

**There is a lack of clarity and consistency in the process by which policy is developed and amended, and how new or amended policies are communicated to staff.**

Focus group participants reported they were not directly involved in policy development, that policies and procedures are based on minimum jail standards and "the direction the sheriff or chief want to go."

Some focus group members expressed concern with the method by which policy or procedure changes are documented and communicated to staff. In some cases, the new information is put in memo form and read by supervisors at shift meetings.

One focus group participant commented that a new policy might be read at shift meetings for a couple of days but, if the staff member is off for a few days and does not attend a staff meeting at which the new policy is read, he or she is not made aware of the change.

When we raised this during the supervisors' focus groups, they disagreed, saying new policies or procedures are read for many days at shift meetings.

In other cases, all focus groups agreed, a new policy might be posted on a bulletin board which, by policy, staff are responsible for checking and signing.[2]

When we asked one focus group how the agency verifies employees have reviewed new policy, participants said sergeants will read the new policy at briefing and have everyone sign it. Other focus groups indicated this was not always the case.

**RECOMMENDATION 23:**

**Establish written guidance on the process for how new or amended policies are communicated to staff.**

**FINDING:**

**The policies and procedures manual is not regularly reviewed and updated.**

It appears parts of the policies and procedures manual were appropriated from other organizations' manuals without editing them to ensure their applicability to the Smith County jail.

When a gap in policy or procedure is identified, it can be appropriate and expedient to borrow from other agencies' manuals, so long as the policy being appropriated is vetted to ensure its applicability to the Smith County jail.

It appears the vetting process in some cases may have had gaps. For example, Policy 3.09, Sexual Harassment, defines sexual assault as, "any sexual touching or contact that is non-consensual, forced or coerced in any manner, including rape, sodomy or unlawful touching as

---

[2] Smith County Detention Division Policies and Procedures, Policy 2.14, Rules of Conduct, Section 2.30, Bulletin Boards. Also, Policy 100.1, Rules and Regulations for Jailers, Section 2(g).

defined by Mississippi statutes." That has been the official policy since January 1, 2013, when it was implemented and last reviewed, according to the policy manual. That it has existed in policy for nearly 10 years highlights the need for a regular policy review process.

In addition, the first 74 pages of the detention division policy manual appear to be selected excerpts from a separate law enforcement policy manual.

The title block for the law enforcement policies and procedures includes a space for "Revision Date," but not a "Review Date," while the detention division policies and procedures page heading block includes a space for "Review Date," but not a "Revision Date."

With two exceptions, the detention policies all have a review date of October 13, 2016.

One policy was revised in 2021, Policy 100.9 addressing the procedure for accepting bail bonds. Prior to that, the last revision was 2018, when Policy 3.14 addressing use and security of issued electronic devices, Policy 4.26 addressing the use and care of vehicles and Policy 5.01 addressing use of force were revised. We understand a review date that occurred in the past is the date the policy was last reviewed. Likewise, where a revision date is listed, we understand that to be the date the policy was last revised.

**RECOMMENDATION 24:**

**Establish a regular policy review schedule to ensure policies and procedures appropriately address the needs and context of the Smith County jail.**

To accomplish this, the working group (Recommendation 22) should be designated to undertake this work. We also recommend inclusion of a revision date, referring to the date the policy was last revised, and a review date, referring to a future date the policy is scheduled to be reviewed. In addition, we recommend the addition of a block listing the "Supersedes," date, listing the adoption date and policy number of the policy being superseded.

There are a number of resources available in the public domain to provide guidance in this regard. One is the publication "Developing and Revising Detention Facility Policies and Procedures," developed by the National Institute of Corrections. Though it is several years old, its guidance remains sound.

It recommends:

> The policy and procedure manual should be treated as a living document, responsive to organizational changes or other conditions affecting the agency's operation. Establish:

- A procedure for an annual review of the manual. Consider establishing a staggered review schedule to review portions of the manual each month over the course of the year. Assign a review coordinator to help track the process.
- A procedure for revising the manual as needed
- A system for soliciting staff input into recommended revisions

- A system of internal audits to identify potential problems to be addressed through policy and procedure revisions
- Procedures for revising the manual:
  - Issuance of new policies and procedures
  - Notification of all staff of revisions
  - Additional training as necessary

Another NIC resource, "The Sheriff's Guide to Effective Jail Operation," also recommends that policies and procedures be reviewed at least annually and updated as needed.[3]

There are, no doubt, many other counties' jail policies and practices from which one could draw in developing policies and procedures. The Texas Association of Counties also has a Law Enforcement Model Policy Program, to which every sheriff in Texas has been granted access with unique log-in credentials.[4] Sheriffs also have the ability to designate staff in their agency to receive access. Access to the model policies is through an agreement with OSS Academy.

**FINDING:**

**In some cases, policies appeared to be inconsistent and contradictory.**

The consulting team identified some policies to be inconsistent and contradictory. For example, Policy Number 2.14, Rules of Conduct, includes the following two directives, which, on their face appear to be contradictory:

---

1.6   Obedience to Unjust or Improper Orders

If an officer or employee receives an order he believes is unjust or contrary to a departmental order or rule, he must first obey the order to the best of his ability and then may appeal the order to the Chief Deputy.

1.7   Obedience to Unlawful Orders

No officer or employee is required to obey an order that is contrary to the laws of the United States, the state of Texas, or policies established by this department. If an officer or employee receives an unlawful order, he will report in writing the full facts of the incident and his action the chain of command.

---

Elsewhere, Policy No. 100.1, Rules and Regulations for Jailers, provides "Lawful orders given by the supervisor are to be carried out explicitly and without question. If there should be some condition known to the employee rendering the execution of an order dangerous, the officer shall call the matter to the attention of the jail administrator."

---

[3] https://nicic.gov/sheriffs-guide-effective-jail-operations
[4] https://www.county.org/Risk-Management/Risk-Control/Law-Enforcement-Model-Policy-Program

**RECOMMENDATION 25:**

**Revise the jail policy manual to provide clarity and eliminate contradictions.**

**FINDING:**

**The Detention Division Policies and Procedures Manual does not have a consistent vocabulary.**

The manual makes 74 references to "detention officer," 23 references to "jailor" and 21 references to "jailer." This is indicative of the finding above, that the policy manual appears to be a compilation from a variety of sources. While anyone who reads the policy manual would understand the role being referred to, consistency in terminology is important in policy construction.

**RECOMMENDATION 26:**

**Revise the policy manual to use consistent terminology, including consistent term for referring to line staff.**

Consideration should be given to adopting the terms and definitions found at Sec. 253.1 of the Minimum Jail Standards, which uses the term "jailer" to refer to a person appointed or employed as a county jailer. Whichever term is selected, it should be used consistently to the exclusion of other terms.

**FINDING:**

**Policies and procedures do not reference the statute or jail standard with which they are intended to comply.**

Some, perhaps even most, policies and procedures are intended to address a specific statute or jail standard. The policy development process should ensure there is a policy or procedure that addresses compliance with every applicable statute and jail standard. Without that reference, there is no mechanism to ensure the Smith County jail is complying with all applicable statutes and standards.

**RECOMMENDATION 27:**

**Revise the policy manual to cite statutes and standards.**

Where applicable, policy should cite to the statute(s) or standard(s) it is addressing and with which it is intended to comply. As part of a regularly scheduled policy review process, applicable statutes or standards should be reviewed and policies amended as necessary to ensure they address any statutory or regulatory changes.

**FINDING:**

**The sections of the policy addressing the pre-admission screening are not clear as to roles and responsibilities.**

The policy appears to place responsibility for the pre-admission screening and determining that a prisoner is medically stable and eligible for admission to the jail on booking officers and their supervisors. We were under the impression that health services staff were completing the pre-admission screening.

**RECOMMENDATION 28:**

**Review the responsibilities of booking officers for pre-admission health screenings and clarify the policy manual.**

If booking officers are completing the pre-admission health screening and/or making decisions as to prisoners' medical stability and eligibility for admission to the jail, the jail should evaluate whether that is an appropriate role for booking officers with no training in health care evaluation and whether the practice adequately protects the county from added financial liability.

**FINDING:**

**The medical screening station is situated at a desk in a transition space between the intake area and the booking desk within sight and sound of other inmates and staff.**

We observed health services staff in the intake area transition space conducting inmate screenings. It was not clear whether these were pre-admission screenings or medical screenings of inmates already admitted to the jail. In any event, the screenings were taking place within sight and sound of other inmates and staff.

**RECOMMENDATION 29:**

**Move the medical screening desk to a location that provides privacy to protect inmates' confidentiality.**

The jail should revise the current layout to address inmate privacy issues that could cause inmates concern about others overhearing sensitive medical information which may cause them to be less than forthcoming about their health condition.

**FINDING:**

**The jail's inmate complaint/response policy and practice appear to comply with Texas Minimum Jail Standards and ensure staff responses to inmate complaints are responsive and timely. The policy document introduces some confusion, however, by including policy guidance on grievances in the policy on inmate discipline.**

Inmate grievances are addressed in Policy 100.33.

Inmates are informed of their ability submit a grievance in the Inmate Rules and Regulations document. The policy encourages staff to attempt to resolve issues so as to eliminate the need for a formal grievance.

Inmates are able to file grievances by completing an inmate request form and checking a box to indicate it is a grievance and not a routine request. Those forms are forwarded by staff to the grievance officer. The policy provides that every shift supervisor is a grievance officer and

requires the shift supervisor to attempt to resolve the grievance. It also requires emergency grievances to be acted upon immediately.

Inmates also have the ability to send a complaint directly to the TCJS. If the inmate believes the situation giving rise to the complaint constitutes an emergency, they are encouraged to send it through the grievance process, which requires a review within 24 hours.

The policy requires the grievance officer to investigate the grievance and respond to the inmate within 15 days, either substantiating or denying the grievance. If substantiated, the response must indicate what steps will be taken to resolve the issue. If denied, there is a mechanism for appeal to the grievance board.

The policy requires the grievance board to further investigate the grievance and respond to the inmate within 30 days.

The inmate has the further ability to appeal an unfavorable result to the jail administrator, with further appeal to the sheriff.

Texas Minimum Jail Standards Sec. 283.3 requires a written grievance plan and the jail's policy appears to meet the standards.

We did note that, while 100.33 is a stand-alone grievance policy, Policy 100.30, the policy addressing inmate discipline, also includes content addressing inmate grievances.

**RECOMMENDATION 30**:

**Review that portion of Policy 100.30 addressing inmate grievances and determine whether it is appropriately part of the policy addressing inmate discipline or should be removed.**

**FINDING:**

**In some cases, newly admitted inmates are not being medically screened for up to six days.**

While health services staff tries to conduct initial medical screenings within 24-48 hours of admission, in some cases, we were told, inmates are not receiving an intake medical screening for up to six days after admission. One of the common causes for this is inmate refusal.

Texas minimum jail standards require a separate health record on each inmate, which "shall include a health screening procedure administered by health personnel or by a trained booking officer upon the admission of the inmate to the facility."[5]

The health screening requirement is restated in the minimum jail standard addressing objective classification, which requires a screening "[t]o be completed immediately on all inmates admitted for the purposes of identifying any medical, mental health or other special needs that require placing inmates in special housing units."[6]

---

5 Texas Minimum Jail Standards, Title 37, Tex. Admin. Code, Part 9, Ch. 273.4(a)

6 Texas Minimum Jail Standards, Title 37, Tex. Admin. Code, Part 9, Ch. 271.1(b)(1)

Finally, jail policy requires medical staff to complete a medical screening on all newly-admitted inmates.[7]

In its standard addressing health screens, the American Corrections Association's Standards for Adult Correctional Institutions comments that the purpose of a screening is to prevent newly arrived inmates who pose a health or safety threat to themselves or others from being admitted to the general population, as well as to identify offenders who require immediate medical attention.

A 2016 special report by the Bureau of Justice Statistics reported that 40 percent of local jail inmates reported having at least one current chronic medical condition.[8] Medical staff during our site visit estimated that half of Smith County jail inmates were on prescription medication.

**RECOMMENDATION 31:**

**Change the current health screening practice to better satisfy jail standards and adequately protect inmates and staff from health and safety threats.**

The county should evaluate whether delays in initial health screenings could create potential financial liability in increased inmate and employee healthcare costs.

**FINDING:**

**It appears there is no formal policy guidance directly addressing attorney visitation practices.**

We were not able to locate written policy guidance on attorney visitation during our site visit, but we learned from one staff member during our visit that it is normally conducted 8:00 a.m. to 5:00 p.m. Monday through Friday, either by video or in person. When we spoke to the jail administrator, though, he informed us that attorneys can visit any time before lights out. In either case, attorneys can call the jail to schedule a video visitation or can visit in person. The central jail has six attorney visitation booths and has dedicated officers to escort inmates from their housing area to the attorney visitation area.

Policy 100.3, General Jail Rules, in a section dealing with the inmate armband requirement, provides that inmates without arm bands will be allowed to visit their attorney. Policy 100.15, Admission to Secured Areas, grants attorneys access to conference rooms in secured areas of the jail in order to meet with clients. A separate policy, 400.6, Low Risk Facility Security, grants attorneys access to conference rooms to visit clients at that facility.

---

7 Smith County jail Policy 300.11, Inmate Physical Status
8 "Medical Problems of State and Federal Prisoners and Jail Inmates 2011-2012, Bureau of Justice Statistics," https://bjs.ojp.gov/content/pub/pdf/mpsfpji1112.pdf

The jail has a policy and procedure entitled "Inmate's Rights to Counsel," which addresses ensuring inmates are informed of the process for requesting appointment of counsel, but it does not address attorney visitation.

Subsequent to our site visit we were provided with an email from the sheriff to jail command staff dated December 3, 2021 that provides guidance on attorney visitation. This email stated the following:

- Scheduling of visit with inmates will be encouraged but not required. With that being said, a scheduled Zoom or in-person meeting will take precedence over drop-in visitation.

- We will not limit daily attorney/inmate visits, however, we will only bring three inmates down at a time (depending on danger level). Upon completion of the first three visits, additional inmates will be made available for visits.

- We will continue Zoom meetings as well as in-person visits.

- Visitation will be made available to attorneys 8:00 a.m. to 9:00 p.m. seven days a week, 365 days a year.

This finding is representative of several policy issues we identified during our site visit in that policies and practices in the jail can be found in a variety of formats, communicated in a variety of ways, with no actual formal, documented policies in place to provide clear guidance to jail staff.

**RECOMMENDATION 32:**

**Develop written formal procedures for attorney visitation based on actual practice, both for training purposes and to provide staff with clear guidance on the process of managing the attorney visitation process and ensuring all staff knows the acceptable attorney visitation hours.**

The county should consult with representatives of the District Attorney's Office, the courts and the criminal defense bar in developing these procedures. Further, all jail staff should be trained regarding the attorney visitation procedures.

## Jail Staff Training

The jail's training function resides in the administrative division of the sheriff's office and is overseen by a training lieutenant. We understood at the time of our site visit and interviews there had been recent changes in staff and in the training program itself. We were able interview training staff, including the training coordinator. We were also able to briefly observe on-the-job detention training in the central jail.

**FINDING:**

**The detention training program was designed to build upon the state-mandated basic jail academy much like a field training program builds upon the basic police academy but staffing considerations have forced a reversal of that sequence.**

The introduction in the training manual explains that "The Detention Training Program is designed to provide the beginning county corrections officer an arena for applying the knowledge and concepts learned in the Basic Academy to the work environment." The manual goes on to observe that because the basic jail academy does not adequately prepare the new officer for assignments to work by himself or herself, "a need developed for a training program to help the new officer make the transition from the academy to the jail."

We understand that given challenges in maintaining a full complement of staff, it became necessary to reverse the sequence to put new employees through the on-site detention training program to get them minimally trained so the jail is able to maintain staffing levels, and then later sending them to state-mandated jail training.

A second rationale for reversing the process was a number of new officers have gotten a few weeks into their tenure and resigned and, that by delaying the jail academy by a few months, the county was avoiding the expense of putting someone through the academy, only to have them resign after a few weeks on the job.

It is likely that essential job-related information is imparted, and formation is occurring in the jail academy. Just as the manual concluded that the "basic jail academy does not adequately prepare the new officer for assignments to work by himself or herself," it is entirely likely, neither does the detention training program adequately prepare the new officer for assignments to work by himself or herself.

This training gap is likely a contributing factor to high levels of attrition among newly hired officers.

At the time of our site visit, there were 15 trainees in the detention training program, eight officers in the basic jail academy and 38 officers who had completed the detention training program and were scheduled to attend the basic jail academy. In some cases, we understand, officers wait as long as eight months to attend the basic jail academy. While state law requires completion of the academy within one year of the employment date, it is not ideal to have untrained detention officers working in the jail.

We understand the Sheriff's Office is an approved TCOLE training provider but has never run its own basic jail academy due to the staffing and other costs associated with conducting an in-house academy. There has been a longstanding preference to use Kilgore Junior College.

**RECOMMENDATION 33:**

**Evaluate the delivery mechanism of detention officer training.**

Evaluate whether a new officer who has completed the detention training program but not the basic jail academy is adequately trained to function independently, and whether that practice is a contributing factor to high attrition rates

The jail should not hold candidates back from attending jail school strictly for financial reasons, as we feel this is a contributing factor in employee morale and could be exacerbating the turnover issues.

If the jail determines that the current practice is the preferred training sequence, the training material should be modified to reflect the reality that officers go through the detention training program and work independently in some cases for months before they attend the basic jail academy.

**FINDING:**

**The detention training lieutenant and coordinator are not organizationally in the jail chain of command.**

The detention training manual introduction explains that "The Detention Officer Training Program Coordinator is a duty of the Detention Division, assigned by the Sheriff." As it was explained to us, the lieutenant and coordinator do not report organizationally to the jail administrator. It appears that this structure creates parallel chains of command. The new detention officers and the detention training officers work in the jail chain of command as it relates to jail operations, but there is a separate chain of command as it relates to the training program.

This puts detention training officers in the difficult position of being accountable to two chains of command and potentially receiving directives from their shift supervisor that countermand directives from the training coordinator.

One officer recounted a case when a shift sergeant separated a trainee still in the detention training program from his detention training officer due to staffing shortages. This means a trainee who had not completed the detention training program was deployed in the jail without a training officer. The new officer resigned shortly thereafter, complaining that he did not feel adequately trained. That should never happen and would not happen with a unified chain of command.

**RECOMMENDATION 34:**

**Reorganize sheriff's office staff to place the training lieutenant and coordinator under the supervision of the jail administrator.**

Because the jail administrator is ultimately accountable to the sheriff for all aspects of jail operation, including the performance of staff in his chain of command, and is held accountable for the success of the jail mission, the detention training program should reside organizationally in the jail chain of command.

**FINDING:**

**The detention training program has a well-organized on-the-job curriculum that covers many important topics, but the training manual is filed as part of the permanent training record at the conclusion of training.**

The curriculum involves use of a training manual that the trainee and his/her detention training officer complete through the course of the training period. Both the trainee and detention training officer sign off that each training topic has been completed, and the training coordinator reviews progress at the end of each phase.

At the end of the training period, the trainee submits his/her training manual, which contains step-by-step instructions for the range of daily activities a detention officer performs. The manual is filed away as a permanent training record.

We suggested officers should be allowed to keep a copy of the manual, a document that could serve him/her and the jail very well as an ongoing resource when he/she has questions in the future about specific procedures. The training coordinator said he was going to implement that suggestion immediately.

**RECOMMENDATION 35:**

**Provide new detention officers with a copy of their training manual at the conclusion of the detention training program.**

**FINDING:**

**The Smith County jail has a large number of inexperienced jail staff members.**

A review of 206 Smith County jail staff training records indicated 56 staff members (27 percent of all staff) to be working with a temporary jailer's license. Temporary jailers' licenses are issued by the Texas Commission on Law Enforcement for persons who have not attended the TCOLE Basic County Corrections TCOLE# 1120 class. This class must be completed within one year of employment in order to attain a permanent jailer's license and continue employment within the jail. Staff who are only temporarily licensed should be supervised by experienced staff during the initial training phase of employment. Temporarily licensed staff may not be experienced in dealing with inmates and may not be familiar with TCJS requirements regarding county jail operations. This lack of experience can lead to deficiencies relating to safety, security and sanitation in the jail. The number of newly hired employees compared to the turnover rate is illustrated below in Figure 15.



Figure 15. Smith County Jail New Hires and Turnover Rates 2019 - 2021

**RECOMMENDATION 36:**

**Review the county's jail training program to ensure the adequacy and competency of staff assigned to training new detention officers.**

The industry standard for detention officer training includes a written curriculum which tracks jail policy and procedure. The training program should include daily observations documented by the training officer with signed acknowledgment by the trainee. This allows a documented tracking of training progress or lack thereof and facilitates documented communication between the training officers and the trainees.

# APPENDIX A
## MOCK JAIL INSPECTION

The Smith County jail has a history of non-compliance with Texas Minimum Jail Standards dating back to April 2019. During the 2019 annual inspection, the Texas Commission on Jail Standards (TCJS) inspector cited Smith County for failing to offer recreation to inmates housed on the second and third floors of the central jail. During this same inspection a litany of technical assistance items was documented to include: inmates not signing a property receipt to acknowledge proper documentation of the property logged during the admission process, improper handling of inmate uniform laundering, refurbishment of showers needed, graffiti remediation, and improper handling of inmate grievances. The technical assistance items were all assigned for follow-up action by jail administration. In May 2020 Smith County was again cited by TCJS for non-compliance. Issues of non-compliance included failure to adhere to the approved inmate menu and not offering recreation to inmates housed on the second and third floors of the central jail. The 2020 inspection report was again rife with technical assistance issues to include: improper health services procedures, serving meals on food trays that were not clean and dry, improper disciplinary procedures and improper grievance procedures.

The annual inspection of the Smith County jail conducted in June 2021 resulted in several issues of non-compliance to include a failure of the smoke removal system while operating on emergency power. The County was cited for non-compliance with regard to unsigned inmate property inventories, an issue addressed through technical assistance in the April 2019 inspection. This inspection revealed staff at the facility were again not laundering uniforms and washable items according to the required standard. This was an issue addressed with technical assistance in the April 2019 inspection. The third area of non-compliance was a result of incomplete inmate rules acknowledgements. The June 2021 annual inspection report contains another litany of technical assistance issues to include: improper disciplinary and grievance procedures, failure to follow operational plan with regard to supervision of inmates on suicide watch, incomplete documentation of life safety training for staff, and failure to complete the suicide screening instrument and/or notify magistrate as required within 12 hours.

TCJS conducted an inspection of Smith County jail on February 18, 2022, which resulted in findings of non-compliance. The issue with incomplete documentation of staff life safety training which was mentioned through technical assistance in the June 2021 report was found to be a continuing problem and this time was documented by TCJS as an issue of non-compliance. Smith County was provided technical assistance with regard to completion of the suicide screening form and failure to notify a magistrate within 12 hours after a positive response on the screening form. These issues persisted and were cited as areas of non-compliance. TCJS conducted a special inspection in response to an inmate complaint in March 2022. The County was cited for non-compliance as a result of housing an inmate in a holding cell for eight days. During the mock inspection the consultant observed inmates being housed in holding cells and was told by staff they used the holding cells to keep suicidal inmates under closer observation.

The following is a summary of findings and recommendations based on the mock inspection conducted by our team member of the Smith County jail beginning Monday February 28, 2022, through Tuesday March 1, 2022. In addition, our team member reviewed documentation and past inspection reports including of non-compliance issued by the TCJS up through June 2022.

My inspection began with a tour of the direct supervision housing (towers). Inmates are housed two per cell and behind a locking door. Cells are configured on upper and lower tiered levels and open into a common dayroom. Direct supervision housing capacity pods is 48 inmates and Smith County has a total of eight of these pods for housing male and female inmates. Inmate recreation areas are each shared by two pods. Many of the individual inmate cells I toured were found to have graffiti on the walls, lights and air vents covered and intercoms which had been covered with paper, plastic or toothpaste. While these types of issues are common in a jail, the design and staff supervision concept of direct supervision housing should mitigate these issues. In one of the pods I observed five to six soft drink bottles which appeared to have been thrown from the dayroom up onto a window ledge in front of the recreation area. The window ledge is approximately 18 feet high and in plain view of the officer's work station.

**Recommendation:** Staff assigned to direct supervision housing should conduct documented inspections of the unit at the onset of their shift. Coverings of lights, vents, and intercoms should be removed immediately. Graffiti on walls should not be tolerated by staff. Inmates should be held accountable for the condition of their living area. These are issues directly related to the safe, secure and orderly operation of the facility and require vigilance by staff in order to be kept to a minimum.

After completing the tour of direct supervision housing, I was escorted to the intake and holding area of the jail. During this segment of the tour I observed four male inmates, all clad in suicide resistant smocks, housed in a holding cell. Staff reported that the inmates remain in this holding cell until cleared by medical staff and no longer deemed as a suicide risk. While this may present a beneficial setting for staff observation of suicidal inmates it is an area of concern regarding a violation of Texas Minimum Jail Standards. Holding cells are defined in Administrative Code Chapter 259.138 that expressly forbids holding an inmate in this cell over 48 hours.

**Recommendation:** Administration should designate another housing unit for observation of suicidal inmates. The observed practice places the facility at risk for a finding of non-compliance by Texas Commission on Jail Standards.

During the tour of the linear style jail many of the same issues with lights, vents and intercom coverings were observed. Documentation presented by staff indicates the linear jail is understaffed. The records I observed were from December 26, 2021, with 134 inmates housed on the second floor and only two officers assigned to this floor. On this same date the roster documented 138 inmates housed on the third floor with only two officers assigned to the floor. The documentation I reviewed revealed the facility was understaffed on the second and third floors as recently as February 28, 2022. Texas Administrative Code Chapter 275.4 requires a ratio of one officer per 48 inmates housed on the floor. Adequate staffing is essential to providing a safe, suitable and sanitary jail facility.

With regard to the June 21-23, 2022, TCJS annual inspection I reviewed the following:

Life Safety-the smoke removal system which failed to operate on emergency power has been corrected. The emergency generators were run on load at the Central Jail and at the North Jail. Fire drills were conducted at both facilities while on generator power and the fire alarm and

smoke removal systems functioned properly. Documentation of quarterly life safety training for staff indicated this requirement is being met.

**Admission:** My review of a random sample of 50 inmate files indicated that corrective action has been taken to ensure inmate property is carefully inventoried and property records are signed by the receiving officer and inmate. Inmate files I reviewed all contained this documentation as required.

**Health Services:** My review of a random sample of 50 inmate files indicated the Screening Form for Suicide and Medical/Mental/Developmental Impairments is being completed in its entirety. I found no instances of exceeding the twelve hour required notifications for magistrates.

**Supervisio**n: Staff have completed an updated mental health operational plan with regard to observation checks on suicidal inmates. This updated plan has been submitted to TCJS for their approval.

**Personal Hygiene:** Staff now issue two clean uniforms to all inmates who are assigned to housing. Uniform exchange is being conducted in a one for one exchange. Staff have sufficient washable items such as sheets, towels, and mattress covers to permit these items being exchanged for clean replacements once a week. This inspector did not receive any inmate complaints regarding uniforms or laundry during the inspection.

**Sanitation:** Violations recorded during the annual health inspection conducted on February 25, 2021 have been corrected.

**Discipline:** My review of a random sample of 50 inmate files found no blank or missing inmate signature on inmate rules acknowledgement. Documentation presented by staff indicates the follow-up action required by TCJS regarding disciplinary sanctions has been completed.

**Grievances:** A review of 50 randomly selected inmate grievances indicates inmate grievances are being handled in accordance with Minimum Jail Standards requirements.

**Exercise:** Conducted walk through of both jail facilities. Reviewed documentation. Interviewed staff and inmates.

While not documented in the most recent TCJS inspection report, the following were areas of concern:

Smith County Operational Plan for inmate classification states all inmates will have their classification reassessed every 30 days. In practice, staff are conducting classification reassessments every 90 days.

**Recommendation:** Staff should update the operational plan for inmate classification to reflect that inmate classification be reassessed every 60 to 90 days. The current operational plan was last reviewed and approved by TCJS in 2013.

**Recommendation:** documentation of administrative separation housing review and reassessment should be maintained together in a separate logbook. This review and reassessment is required for inmates housed in administrative separation for continuation of status at least every 30 days.

Keeping this documentation in a centralized log makes it easier for supervisory staff to review and ensure that the 30-day reassessment requirement is maintained. I provided staff with a sample form used to document the reassessment.

Staff expressed concern that the Smith County jail was exceeding the approved inmate capacity. On the days of my inspection the population was within 18 inmates from being at 100 percent capacity. Although not required by Texas Minimum Jail Standards, it is a frequent and general recommendation to all jails that a 10 percent vacancy rate be maintained to allow for inmate movement related to changes in classification and / or disciplinary action.

Adequate staffing for the Smith County jail is not being maintained. This was evidenced in reviewing staffing rosters. Inadequate staffing in a jail often leads to serious safety and security issues affecting both employees and inmates. It is recommended that action be taken to reduce the Smith County jail inmate population. Population reduction targets are typically pretrial misdemeanor inmates, contract inmates and convicted felons.

**Recommendation:** Staff should work toward decreasing the amount of time from date of conviction to paper ready status for transfer to TDCJ.

During the inspection I was provided a copy of a written report by the Sergeant over Compliance which listed areas of non-compliance. Areas of non-compliance referenced in this report included:

- Inmates being held in holding cells exceeding 48 hours.
- Video recreation (videos with exercise routines) not functioning properly at central jail.
- Inmate correspondence is delivered electronically. This is not covered in the current operational plan.
- Form used for restraint chair observation checks states 30-minute observations. Minimum Jail Standards requires 15-minute checks.
- Inmates are going past the 7-day requirement before having a TB test.
- The facility does not have a documented procedure or form for medical refusals.
- No documentation of observation checks is maintained for court transfer cells.

After reviewing previous TCJS inspection reports and conducting an on-site inspection it is my conclusion that a complete lack of consistency exists in the Smith County jail with regard to adherence to Texas Minimum Jail Standards.

**Recommendation:** Smith County should continue with internal compliance inspections. Serious infractions should be immediately reported to the Jail Administrator. Partnering with another County to conduct mock inspections at each other's facility is another proven method of a peer review audit.

# **APPENDIX B**
# LIST OF INTERVIEWEES

| Interviewee | Title/Position at Time of interview |
|---|---|
| Justin Bell | Jail Lieutenant, North Jail |
| Larry Christian | Public Information Officer and Office of Professional Responsibility |
| Katrina Cumings | Jail Human Resources |
| Daniel Custer | Jail Lieutenant |
| Adrienne Duncum | Sheriff's Administration Timekeeper |
| Jimmy Jackson | Law Enforcement Chief, formerly in recruitment |
| Keith January | Chief, Jail Administrator |
| Matthew Lazarine | Training Lieutenant |
| Heather McCarver | Jail Lieutenant, Classification and Booking |
| Marvin Martin | Captain |
| William Phariss | Jail Sergeant of Compliance |
| Amy Ridgeway | Sheriff's Office Human Resources |
| John Shoemaker | Jail Lieutenant |
| Larry Smith | Sheriff |
| Robert Strickland | Lieutenant, Office of Professional Responsibility |
| Marsha Smith | Jail Sergeant (Classification) |
| Callie Talamantez | Sheriff's Office Administration |
| Esmeralda Delmas | County Human Resources Director |
| Bonnie Maxfield | Assistant Auditor |
| Gary Pinkerton | Pretrial Release Director |
| Ann Wilson | County Auditor |
| Nathaniel Moran | County Judge |
| Neal Franklin | County Commissioner Pct. 1 |
| Cary Nix | County Commissioner Pct. 2 |
| Terry Phillips | County Commissioner Pct. 3 |
| JoAnn Hampton | County Commissioner Pct. 4 |
| *Focus Group Participants* | |
| Dakota Coble | Detention Officer |
| Devin Hunt | Detention Officer |
| Ulices Juarez | Detention Officer |
| Mike Lovil | Detention Officer |
| Emma McCalla | Detention Officer |
| Latoya Medford | Detention Officer |
| Jennifer Mink | Detention Officer |
| Officer Moncrief | Detention Officer (dedicated recreation officer) |
| Renauta Phillips | Detention Officer |
| Dean Sanderson | Detention Officer |
| Linda Williams | Detention Officer |
| Jonathan Amador | Jail Sergeant |
| Albert Escobedo | Jail Sergeant |
| Samuel Germany | Jail Sergeant |
| Jacob Harper | Jail Sergeant |
| Ethan Isaacks | Jail Sergeant |
| Kari Kamin | Jail Sergeant |

# <u>APPENDIX C</u>
# SUMMARY OF RECOMMENDATIONS AND FISCAL IMPACTS

| Recommendation | Fiscal Impact |
|---|---|
| 1.  Establish 24/7 coverage in the classification unit. | $0 |
| 2.  Develop a written curriculum or guidance for training new booking officers and provide refresher training. | $0 |
| 3.  Incorporate the procedural aspects of inmate booking into the agency's formal policy manual. | $0 |
| 4.  Incorporate the procedural aspects of the booking functions into a new classification policy. | $0 |
| 5.  Install a dedicated TCIC/NCIC terminal in the classification section. | $3,000 |
| 6.  Improve communications within the Smith County jail and require leadership training. | $0 |
| 7.  Implement leadership training for jail command staff. | $0 |
| 8.  Establish a process for reviewing compliance in the jail. | $0 |
| 9.  Consider changing from 12-hour shifts to either 10-hour or eight-hour shifts to help with employee burnout which is contributing to turnover rates. | $0 |
| 10. Conduct a staffing analysis to include determination of a relief factor for the Smith County jail. | $80,000 |
| 11. Conduct an assessment of the county's pretrial services functions to determine if more inmates could be released from the jail while awaiting trial. | $0 |
| 12. Increase the alternatives available to defendants that allow them to be released from jail while awaiting adjudication. | $0 |
| 13. Conduct a review of how long, on average, it is taking for inmates to become paper ready. | $0 |
| 14. Examine the costs involved with training and equipping newly hired employees and paying them overtime compared to the costs of attrition. | $0 |
| 15. Use the interest in detention officer positions as a "steppingstone" to other law enforcement careers as an incentive for detention officer positions. | $0 |
| 16. Implement training programs and provide part-time employment opportunities to improve employee retention. | $0 |
| 17. Consider implementing a bonus program to incentivize longevity among jail staff. | $240,000 |
| 18. Implement written policies and procedures for promotion to sergeant. | $0 |
| 19. Review the detention training program for new employees. A robust and comprehensive training program may reduce the amount of attrition among newly hired employees. | $0 |
| 20. Encourage career development for jail staff. | $0 |
| 21. Implement the use of periodic employee satisfaction surveys. | $0 |
| 22. Form a working group to overhaul the policy manual and organize policies and procedures into a logical sequence. | $0 |
| 23. Establish written guidance on the process for how new or amended policies are communicated to staff. | $0 |

| Recommendation | Fiscal Impact |
|---|---|
| 24.   Establish a regular policy review schedule to ensure policies and procedures appropriately address the needs and context of the Smith County jail. | $0 |
| 25.   Revise the jail policy manual to provide clarity and eliminate contradictions. | $0 |
| 26.   Revise the policy manual to use consistent terminology, including consistent term for referring to line staff. | $0 |
| 27.   Revise the policy manual to cite statutes and standards. | $0 |
| 28.   Review the responsibilities of booking officers for pre-admission health screenings and clarify the policy manual. | $0 |
| 29.   Move the medical screening desk to a location that provides privacy to protect inmates' confidentiality. | $0 |
| 30.   Review that portion of Policy 100.30 addressing inmate grievances and determine whether it is appropriately part of the policy addressing inmate discipline or should be removed. | $0 |
| 31.   Change the current health screening practice to better satisfy jail standards and adequately protect inmates and staff from health and safety threats. | $0 |
| 32.   Develop written procedures for attorney visitation based on actual practice, both for training purposes and to provide staff with clear guidance on the process of managing the attorney visitation process and ensuring all staff knows the acceptable attorney visitation hours. | $0 |
| 33.   Evaluate the delivery mechanism of detention officer training. | $0 |
| 34.   Reorganize sheriff's office staff to place the training lieutenant and coordinator under the supervision of the jail administrator. | $0 |
| 35.   Provide new detention officers with a copy of their training manual at the conclusion of the detention training program. | $0 |
| 36.   Review the county's jail training program to ensure the adequacy and competency of staff assigned to training new detention officers. | $0 |
| Total cost of recommendations | $323,000 |